EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* FRANCISCO ALSINA RIVERA, acusado y apelante.

Número 15622.

*Sometido:* 10 de febrero de 1956. *Resuelto:* 28 de marzo de 1956.

*Santos P. Amadeo* y *Rafael V. Pérez Marchand,* abogados del apelante; *Hon. Secretario de Justicia José Trías Monge* y *Jaime García Blanco, Fiscal Especial, Tribunal Supremo,* abogados de El Pueblo, apelado.

48

El Juez Asociado Señor Sifre emitió la opinión del Tribunal.

Francisco Alsina Rivera apeló de tres sentencias pronunciadas en su contra, una de reclusión perpetua por el delito de asesinato en primer grado y dos de seis meses de cárcel por portar armas e infracción a la Ley sobre Registro de Armas. En el alegato se limita a señalar y discutir errores en que a su juicio incidió la Sala de instancia en el proceso por asesinato. La causa por ese delito, vista ante jurado, fué incoada mediante acusación imputándole al apelante que "ilegal, voluntaria y maliciosamente, con malicia premeditada y deliberación y propósito decidido y firme de matar, demostrando tener un corazón pervertido y maligno, acometió y agredió alevosa y criminalmente al ser humano Aida Acosta Cancel, con un revólver, haciéndole varios disparos e infiriéndole heridas de bala de carácter grave a consecuencia de las cuales falleció...". En el acto de la lectura de la acusación, Alsina Rivera alegó ser inocente "por razón de locura". Lo mismo adujo en los otros dos casos, (1) que fueron juzgados por tribunal de derecho.

El ministerio público en el juicio de la causa por asesinato, presentó evidencia para demostrar que el acusado y su esposa, Carmen Alvarado, ocupaban una habitación en el apartamiento de Milagros Orsini vda. de Espina, situado en la Parada 22, en Santurce y que el día 4 de enero de 1951, el primero fué a la habitación de Aida Acosta Cancel, hija de la viuda de Espina, en actitud pacífica y serena, indicándole a aquélla que la esposa de él quería hablarle, sugiriéndole que fuera a verla. Asintió Aida, dirigiéndose a la habitación de Carmen. La siguió Alsina Rivera y le hizo varios disparos por la espalda, privándola de la vida. Al oír las deto-

---

(1) Según el art. 151 del Código de Enjuiciamiento Criminal, ed. 1935, "El acusado sólo puede alegar la excepción perentoria, confesarse culpable, o negar la acusación". 34 L.P.R.A. sec. 362. La defensa especial de locura como tal no existe en Puerto Rico. La cuestión puede suscitarse dentro de la negación de la acusación.

naciones, la viuda de Espina gritó, "Ay Paco, usted me ha matado a mi hija". En ese momento el procesado disparó dos veces sobre ella. Salió después de la casa, se detuvo brevemente en una fuente de soda y finalmente abordó un taxímetro. Por el camino le pidió al conductor que lo llevara al pueblo de Cayey, a lo que éste contestó que para hacerlo necesitaba autorización de su oficina. En vista de ello el apelante le dió instrucciones de que lo trasladara a la Clínica Juliá. Al llegar a dicha institución, el conductor le pidió que le pagara por la transportación, diciéndole entonces Alsina Rivera, quien ya le había mostrado un revólver: "quedan dos balas, una para tí y otra para mí". Ante esa situación el conductor decidió seguir hacia el Cuartel de la Policía de la parada 19 y así lo hizo, regresando a la clínica con varios policías. Allí el acusado entregó el arma al Dr. Juan Homedes, quien la abrió, encontrando que tenía cuatro balas disparadas y dos sin disparar.

El ministerio público también presentó evidencia para demostrar que el apelante, como un mes antes de los hechos, estuvo en Cayey, donde consiguió el revólver con el que hizo los disparos, y que dos semanas con anterioridad a los sucesos había manifestado a la testigo Ángela Falú Torres, que Aida Acosta se estaba inmiscuyendo en la vida de él y de su esposa. No hubo evidencia de que aquélla interviniera en las relaciones matrimoniales de los esposos Alsina Alvarado.

El encausado no presentó prueba para establecer que no hubiera privado de la vida a Aida Acosta. Por el contrario, admitió el hecho, sosteniendo sin embargo, que era inocente por falta de capacidad para delinquir, y adujo evidencia para demostrar su insanidad mental en el momento de perpetrar el acto.

La prueba sobre ese extremo reveló que el procesado, veterano del ejército, estuvo recluído en el Hospital Rodríguez desde el 10 de noviembre de 1947 al 3 de diciembre de ese año "por razón de esquizofrenia" y en la Clínica Juliá, por

igual causa, en cuatro ocasiones con anterioridad a los sucesos, la última, durante el período comprendido entre 13 de enero de 1950 y 6 de marzo de dicho año, fecha en que fué dado de alta a petición de su tutora y contra el mejor juicio del facultativo que le atendía, quien hizo constar que el paciente debía "ser considerado mentalmente incompetente...". El diagnóstico fué siempre de esquizofrenia, manifestada por ideas de tipo persecutorio, alucinaciones auditivas y visuales y episodios de excitación con agresividad, confusión mental y pobreza de juicio.

La defensa presentó evidencia pericial para probar que el acusado era un enfermo mental antes de que privara de la vida a Aida Acosta, en el momento en que lo hizo, así como con posterioridad. Declaró el psiquiatra Dr. Ramón H. Señeriz, que Alsina Rivera salió de la Clínica Juliá a pesar de su oposición, fundada en que aquél "No había recuperado de su episodio psicótico". Manifestó que después del 4 de enero de 1951 tuvo oportunidad de "examinar al paciente... en distintas ocasiones....", llegando a la conclusión de que a mediados de febrero de 1951 y en fechas subsiguientes "todavía predominaban los síntomas psicóticos a que hacía referencia anteriormente", ideas de tipo persecutorio, alucinaciones auditivas, episodios de excitación con agresividad, etc., "lo que significa que el paciente todavía continuaba enfermo, mentalmente enfermo" sin que hubiera "ninguna variación en cuanto al diagnóstico—de esquizofrenia—que hizo en el año 1947". El Dr. Señeriz, a mediados del mes de agosto de 1952, pudo observar que se había iniciado en Alsina Rivera una remisión de síntomas. Explicó lo que esto significaba: "El estado de remisión de síntomas en una enfermedad mental que llamamos nosotros psicosis y en este caso esquizofrenia, quiere decir que el individuo está en pleno dominio de sus facultades mentales." (²)   Aun cuando el testigo no pudo

---

(²) La vista del proceso dió comienzo en 26 de agosto de 1952. El acusado fué examinado por el Dr. Señeriz, quien certificó que Alsina Rivera estaba entonces en condiciones de ser sometido a juicio.

aseverar que el apelante estuviera mentalmente incapacitado al realizar el hecho por el que se le procesó, sí declaró, en contestación a una pregunta hipotética que le hiciera la defensa, que "una persona como se ha descrito por sus actos, la interpretación que yo le doy a esto es que con toda probabilidad estaba respondiendo a ideas delirantes de persecución".

Otro de los psiquiatras que testificó como perito de la defensa fué el Dr. Ramón Fernández Marina. Manifestó que conocía al acusado por haberlo tenido como paciente en el Hospital Insular de Psiquiatría, desde el 17 de febrero de 1951, sufriendo de "esquizofrenia de tipo paranoide", que le duró hasta principios de octubre de dicho año, recayendo más tarde. Expuso que ese padecimiento mental "se caracteriza por los síntomas que el Dr. Señeriz acaba de decir, alucinaciones, auditivas y visuales, oyen voces, oyen que le dicen cosas o que le mandan a hacer cosas; creen que las personas, por ejemplo, tienen ideas que otra persona está contra él". Al preguntársele si "¿Un hombre en esas circunstancias laborando bajo un delirio persecutorio, puede cometer un crimen en la creencia de que realiza un acto legítimo?", respondió, "Exactamente", añadiendo lo siguiente: "Una persona, por ejemplo, le pueden preguntar si es malo matar y dice es malo matar, siendo la pregunta si es malo matar en defensa propia dice que no es malo matar en defensa propia porque el paciente cree lo están persiguiendo, que las personas que mata las mata en defensa propia y cree que no es malo matar en ese momento". Al inquirirse del testigo si lo que acaba de manifestar, "¿Quiere decir que ese hombre en ese momento no discierne de la realidad y la fantasía?", contestó en la afirmativa. A juicio de dicho psiquiatra, Alsina Rivera, "Tiene un pronóstico ominoso en cuanto a recriminación total del futuro", y los actos de violencia realizados por él—trató de agredir a la esposa después del 4 de enero de 1951, estando hospitalizado—"son debidos a su delirio persecutorio".

En último término depuso el Dr. Homedes, Director de la Clínica Juliá. Había testificado antes llamado por el Fiscal. En resumen declaró que el apelante, entre doce y doce y cuarto del día 4 de enero—poco tiempo después de haber hecho los disparos—se presentó en dicha clínica, con un revólver en la mano. Por saber el testigo "en qué circunstancias estaba el paciente nuestro"—refiriéndose al acusado—le abrazó al enfrentarse con él, "abrazo motivado por estas circunstancias y fué un acto de precaución del que no pude rehuir una situación, que era yo. Inmediatamente, al mismo tiempo de abalanzarme a él en una salutación efusiva le llamé la atención sobre lo que tenía en su mano derecha y le dije que me lo entregara y era un revólver negro e inmediatamente nos lo entregó diciendo que efectivamente había venido para entregárnoslo a nosotros, que no lo entregaría a nadie". Depuso así mismo el Dr. Homedes, que Alsina Rivera manifestó "Que acababa de matar a su esposa y a 3 ó 4 personas más..., que se había visto obligado o impelido a hacer lo que creía que había hecho porque le habían traído a esta situación la intervención de personas, de unos vecinos que se habían propuesto desbaratar su matrimonio, desbaratar su hogar, incriminando la reputación de su esposa, y ésa era una situación que él no podía tolerar a nadie, ni incluso a nosotros mismos, 'ni a usted mismo, doctor, si usted incrimina o pretende desbaratar nuestro matrimonio, tampoco se lo vamos a permitir.'" También declaró dicho testigo: "En realidad nosotros reaccionamos en el sentido de decir que no creíamos que había matado a nadie...y tratábamos de desviar su corriente ideativa de una idea fija que él tenía. Él creyendo que nosotros no lo interpretábamos tal como se expresaba, primero trató de recuperar el arma que él nos había entregado a nuestro requerimiento para demostrarnos que había disparado cinco tiros. Él decía, 'doctor si estoy manchado de sangre', y entonces nosotros dijimos, '¿dónde estás manchado de sangre?', 'los pantalones, los zapatos, mire', y miramos y no vimos ninguna sangre".

Después de aludir el Dr. Homedes a su encuentro con el apelante, y a las ocasiones en que éste estuvo hospitalizado en la Clínica Juliá, expresó que en su opinión "en ese día y en ese momento", refiriéndose al instante en que ocurrieron los hechos "el paciente Francisco Alsina Rivera estaba enfermo mentalmente," loco, en el "concepto corriente y popular del término", actuando, "como un enfermo mental activo". (³)

El ministerio público no presentó evidencia directa para demostrar la cordura del reo en el momento en que privó de la vida a Aida Acosta. Descansó en la presunción de cordura y en un certificado médico, expedido en 7 de julio de 1950, aproximadamente cinco meses antes de los sucesos, transcrito en una licencia para contraer matrimonio, en el que se hizo constar por el facultativo que el procesado no sufría

---

(³) Pasamos a transcribir parte del interrogatorio de la defensa:

"P.—¿Cuando el acusado le dijo a usted para convencerle, de que él había matado y usted le decía que no, por razones técnicas, cómo califica usted en términos psiquiátricos la insistencia de él de que estaba lleno de sangre cuando en realidad no lo estaba?

"R.—Eso en realidad son ideas delirantes manifestadas por alucinaciones. Si él ve que está manchado de sangre e insiste y un testigo, en este caso el que habla, mira y no lo ve manchado, se puede deducir que el paciente está viendo cosas donde no están.

"P.—¿Este paciente, por su tipo de enfermedad y en el momento y circunstancias en que usted le vió, podía estar oyendo también cosas que no eran realmente dichas y él podía oírlas?

"R.—Podía, dado que este hombre por su delirio de persecución tenía la idea de que era víctima de alguien que era su amigo.

"P.—¿Podía perfectamente?

"R.—Podía ese hombre pensar, hasta tratar o tramar la destrucción de su mejor amigo por la creencia firme en su delirio de que se había convertido en su enemigo.

"P.—¿Podía hacerlo?

"R.—Era, dentro de la lógica de la ciencia, susceptible, este hombre, de figurarse a su mujer molestada por personas extrañas cuando nadie se ocupaba de su mujer.

"P.—¿Podía este hombre en ese delirio pensar en su propia destrucción, la de su mujer y de todos sus relacionados por creerse perseguido?

"R.—Podía tratar de ejecutar todos estos actos.

"P.—¿Podía, un hombre que sufría de la esquizofrenia de que se ha hecho mención en este caso, concebir una trama contra él y en consecuencia urdir un plan para destruir a los que tramaban contra él, aunque fuera fantástico?

de "locura, epilepsia, idiotez o de enfermedad venérea alguna" que le impidiera contraer matrimonio.

Lo que antecede es un breve resumen de la prueba ofrecida por las partes.

Una vez que el jurado rindió veredicto de culpabilidad en el proceso por asesinato, la Sala de instancia señaló día para dictar sentencia, tanto en ese caso, como en las causas por portar armas e infracción a la Ley Sobre Registro de Armas. No pudo hacerlo en esa ocasión porque "El acusado sufrió un ataque de aparente histeria siendo necesaria la intervención de numerosas personas para reducirlo a la obediencia". El tribunal ordenó que Alsina Rivera fuera recluído en el Hospital de Psiquiatría "hasta que la facultad de dicha institución rinda un informe de que el acusado se encuentra en condiciones de recibir su sentencia." (4)    El apelante fué

---

"R.—Podía perfectamente.

"P.—¿Y un hombre que procede con la calma, con la frialdad y en las circunstancias en que usted vió a Francisco Alsina ese día, afirmándole haber matado a su mujer y 4 personas más, cómo puede decirse que ha llegado a ese estado, esa crisis, por qué cosas llega ese hombre a crearse esa situación en que resuelve destruirlo todo para reconstruir su hogar y su vida; cómo se explica eso en psiquiatría, para que lo entendamos nosotros; por qué tiende un individuo a confundirse en esa forma; qué hay del hombre o del ambiente del hombre que de esa manera lo desvía y lo convierte aparentemente malo cuando no lo es?

"Fiscal Viera: ¿Cuál de las tres preguntas debe contestar el testigo?

"Defensa: Las tres, si puede.

"Fiscal Viera: Objeción a dos.

"Hon. Juez: Una pregunta más sencilla, fué muy larga la pregunta y después haciendo explicaciones.   Hágala otra vez.

"Fiscal Viera: Bien.

"Defensa:

"P.—¿Doctor, qué patología, qué proceso mental llevaba al acusado o llevó al acusado ese día a esa crisis, a esas conclusiones?

"R.—La situación que palpamos en el paciente Francisco Alsina Rivera y los actos que posteriormente nos enteramos había cometido, bajo un punto de vista psiquiátrico están perfectamente explicados teniendo en cuenta la esencia de la enfermedad mental que desde hacía años el paciente venía padeciendo y sin lugar a dudas en ese momento él estaba padeciendo activamente.   Yo quiero decir en manera clara y sin reserva mental que en el acto que yo ví de Francisco Alsina Rivera el día 4 de enero de 1951 él estaba actuando como un enfermo mental activo".

(4) Libro de Minutas F-29, acta del día 3 de septiembre de 1952.

dado de alta a principios de octubre de 1952 después de haber permanecido en dicho hospital durante un breve período de tiempo, y en 22 de dicho mes y año, encontrándose aparentemente en estado de remisión, se dictaron en su contra las tres sentencias apeladas.

██ Repetimos que el procesado sólo apunta y discute los errores que a su juicio fueron cometidos en la vista de la causa por asesinato. En los dos primeros señalamientos se queja de las instrucciones que fueron trasmitidas al jurado "sobre la defensa de locura". La Sala de instancia dió, entre otras, las siguientes: "Los hechos alegados por el fiscal han de probarse fuera de toda duda razonable, *los alegados por la defensa en este caso específico han de ser probados con una preponderancia de la prueba:* ... El acusado ha alegado que si bien dió muerte a la persona a que se refiere la acusación e intentó contra la vida de otro ser humano, él no es culpable, porque al realizar esos hechos lo hizo estando incapacitado mentalmente, o sea que él es inocente porque no distinguía entre el bien y el mal al realizar esos hechos, y era demente. La ley exime de responsabilidad criminal a los locos, dementes, lunáticos e idiotas, a una persona que está enferma mentalmente, que no sabe lo que está haciendo cuando comete un acto delictivo, que no puede distinguir si ese acto es bueno o malo; y la ley lo considera exento de responsabilidad y por tanto es el deber del jurado si entiende que el acusado estaba en esas condiciones en el momento de cometer esos hechos, declararlo no culpable. Los señores del jurado *juzgarán si se han probado esas circunstancias que demuestren que el acusado estuvo loco en el acto en que se cometió el delito, que estuvo loco en el momento de cometer esos hechos.* En causas criminales por delitos graves ocurre a veces que el acusado interpone la defensa de insanidad mental como eximente de su responsabilidad por el acto penable imputádole y por tanto tal defensa ha venido a ser de suprema importancia en la jurisprudencia criminal. La de-

bida consideración y respeto a los fines de la justicia así como a la paz y bienestar de la sociedad, no menos que la consideración que se tenga al acusado, hacen imperativo en el jurado que dicha defensa sea cuidadosamente pesada y considerada. Es una defensa a la que se recurre a veces sin justificación, en casos en que se ofrece prueba tan completa que hace infructuosa la presentación de cualquier prueba u otra clase de defensa; pero tampoco debe ser considerada como una defensa artificiosa y engañosa. *Es una defensa real cuando se prueba fuera de toda duda por una preponderancia de la prueba, que el acusado estaba padeciendo de una enfermedad mental que lo incapacitaba en el momento de cometer los actos por los que se le acusa.*"

Dicho tribunal dió también esta otra instrucción: "Se les instruye además que la ley presume que toda persona es cuerda y no es necesario que El Pueblo presente evidencia de sanidad mental en primer lugar. Sin embargo, *cuando en un juicio criminal se presenta alguna prueba* de la insanidad mental del acusado, corresponde a El Pueblo establecer el hecho de la cordura del acusado lo mismo que cualquier hecho que el Estado tenga que probar para obtener una convicción...". (Bastardillas nuestras.)

Los precedentes judiciales están en abierta y marcada discrepancia, imposible de armonizar, en cuanto a la norma que debe regir sobre el peso de la prueba en lo que concierne a la capacidad o falta de capacidad del reo para incurrir en responsabilidad penal, en el momento de perpetrar el acto de que se le acusa. En unos veinte estados prevalece la doctrina, originada en Inglaterra, como secuela de la absolución del acusado en el famoso caso de *M'Naghten*, 10 Clark & Fin. 200, al efecto de que la locura es una defensa afirmativa que debe ser establecida por el inculpado. En un número casi igual, los tribunales la repudian, resolviendo que en vista de que el sano juicio es esencial para que pueda existir el delito, al ministerio público incumbe demostrar que el proce-

sado era mentalmente capaz de concebir la intención criminal requerida para que el acto imputádole sea un acto punible. Desde luego, de acuerdo con esta última norma, mientras la cuestión de la sanidad mental no se pone en disputa mediante la presentación de evidencia, la presunción de cordura releva al Estado de tener que aducir prueba sobre el sano juicio del acusado.

Las decisiones que consideran la locura como defensa afirmativa que debe establecer el encausado, discrepan en lo que respecta al quántum de evidencia que debe aducir para lograrlo. En varios de los casos antiguos se resolvió que el procesado estaba obligado a probarla más allá de duda razonable, criterio que ha sido abandonado en todas partes, con excepción del estado de Oregón, en donde prevalece por mandato de ley. Algunos tribunales requieren prueba de la locura "a satisfacción del jurado". Los de otros exigen que la establezca el inculpado "a satisfacción del jurado por preponderancia de prueba" y algunos "a satisfacción razonable". La norma que sin duda predomina es al efecto de que debe demostrarla mediante preponderancia de la evidencia. En cuanto a la regla de que incumbe al ministerio fiscal probar la sanidad mental, podemos decir que con excepción de las decisiones de las cortes de uno o dos estados, de las de la Corte Suprema de Estados Unidos y de las cortes del Distrito de Columbia, de acuerdo con las cuales basta que se ofrezca *alguna evidencia* sobre la ausencia de sano juicio para que El Pueblo quede obligado a probar la cordura, el principio generalmente aceptado es el de que ese deber lo tiene el ministerio público, si la evidencia es suficiente para crear duda razonable en el ánimo del juzgador sobre la responsabilidad del reo. En tal caso, el Estado viene obligado a establecer más allá de duda razonable la capacidad mental, al igual que está obligado a hacerlo con respecto a cualquier otro hecho.

Dicho lo que antecede, procede que hagamos un breve examen de las instrucciones transcritas, trasmitidas por el tribunal sentenciador.

Como se habrá notado, dicho tribunal instruyó al jurado que mientras el fiscal debía probar fuera de toda duda razonable los hechos que alegaba, *al acusado incumbía demostrar que estaba loco cuando privó de la vida a Aida Acosta Cancel*, con lo que le impuso el peso de probar su incapacidad, adoptando así una de las dos reglas que han recibido sanción jurisprudencial. Sin embargo, al hacerlo comunicó al juzgador por un lado, que Alsina Rivera estaba obligado a persuadirle de su falta de capacidad mental mediante *preponderancia de la prueba* y por el otro lado, que ello debía lograrlo probando la locura fuera de toda duda. Después dió la instrucción al efecto de que una vez presentada *alguna prueba* de locura, correspondía a El Pueblo el deber de demostrar "el hecho de la cordura... lo mismo que cualquier otro hecho que el Estado tenga que probar para obtener una convicción". En esa instrucción dicho tribunal aparentemente adoptó la doctrina que impone al ministerio fiscal el peso de probar en última instancia la capacidad mental.

Es evidente que las dos primeras instrucciones son inconsistentes e irreconciliables entre sí, e igualmente obvio que confligen con la última, conflicto que tampoco puede ser armonizado, toda vez que no es posible lograr armonía entre la doctrina que coloca sobre los hombros del procesado el peso de probar la locura, con el postulado que impone al ministerio fiscal el demostrar, más allá de duda razonable, la capacidad mental para incurrir en responsabilidad, si se presenta evidencia poniéndola en tela de juicio. En vista de tales circunstancias es inevitable la conclusión de que el jurado quedó sin orientación alguna en cuanto a la norma que debía servirle de guía en sus deliberaciones en el proceso de ponderar y apreciar la prueba con respecto al factor de la locura, de vital importancia en la causa, y en libertad absoluta de re-

solver la confusión en que se le dejó, escogiendo caprichosa y arbitrariamente entre doctrinas conflictivas, en otras palabras, determinando el jurado qué regla era de aplicación con respecto al peso de la prueba, función de la competencia exclusiva del magistrado que presidía el tribunal sentenciador.

■ El error que acabamos de apuntar por ser de carácter fundamental no puede obviarse recurriendo al principio de que no procede la revocación cuando las instrucciones, consideradas global y conjuntamente resultan suficientes y adecuadas. Las trasmitidas en el caso de autos no permiten la aplicación de dicho principio. Tampoco puede hacerse caso omiso de dicho error por el hecho de que no se tomaran excepciones específicas a las instrucciones, ni se solicitaron especiales o adicionales. El acusado, por ejemplo, ha podido ser convicto, ¿y quién podría asegurar que no lo fué?, estando el jurado bajo la creencia de que a aquél le incumbía el peso de probar la ausencia de cordura en el momento de privar de la vida a Aida Acosta, y que el acto de matar fué producto de su demencia, o sea, adoptando una de las normas de que fué informado, altamente perjudicial para el apelante, y que no puede tener la sanción de esta Corte por ser la menos racional, la más injusta y la que en grado mayor se aparta de principios cardinales y básicos de nuestro sistema de enjuiciar.(⁵)

Significa ella que la cuestión de la culpabilidad y la de falta de sanidad mental, suscitan dos cuestiones separadas, y que, aun cuando ambas pueden estar envueltas en el veredicto, el peso de la prueba respecto a la primera lo tiene el ministerio fiscal, mientras que en lo que concierne a la segunda le corresponde al procesado, considerando la locura como una defensa que éste debe demostrar, siendo consecuencias necesarias de la misma el imponer en efecto al encau-

---

(⁵)Nadie podría garantizar que el jurado no apreció la prueba bajo la creencia de que el acusado tenía que probar su incapacidad mental, no ya por preponderancia de la prueba, sino más allá de toda duda razonable, fórmula. esta última que es la más rígida dentro de la norma que impone al procesado el deber de probar su irresponsabilidad.

sado la obligación de probar su inocencia, demostrando que no es culpable del hecho delictivo que se le imputa, y permitir su convicción a pesar de que el juzgador pueda tener duda razonable sobre su sanidad mental, *State* v. *Quigley*, 26 R.I. 263, 58 Atl. 905; *People* v. *Ward*, 105 Cal. 335, y por tanto, acerca de su capacidad para concebir la intención criminal de delinquir, resultados imposibles de reconciliar con la presunción de inocencia que acompaña y protege al reo hasta que El Pueblo prueba que es culpable más allá de toda duda razonable.

No podemos impartir nuestra aprobación a una doctrina que da lugar a las consecuencias anotadas y que se funda en una noción equivocada de la ley. En nuestra opinión la norma de prueba que debe regir cuando se plantea la locura como eximente de responsabilidad, es la que pasamos a exponer. La ley presume que el estado normal es el de la cordura, presunción justificada por la experiencia humana y por consideraciones de orden público, y por ende, que el procesado estaba en su sano juicio en el momento de perpetrar el acto que se le imputa como delito. En virtud de esa presunción El Pueblo no tiene que presentar prueba alguna para demostrar que el acusado estaba cuerdo en ese momento, *mientras* no se ofrezca y reciba evidencia que pueda engendrar duda razonable sobre la cordura, evidencia que debe ser presentada por el encausado, si es que descansa en la ausencia de sanidad mental como eximente de responsabilidad, pero que también puede provenir de la evidencia aducida por el Pueblo al presentar su caso, *Davis* v. *United States*, 160 U.S. 469; *Pribble* v. *People*, 49 Colo. 210, 112 Pac. 220; *Blocker* v. *State*, 92 Fla. 878, 110 So. 547; *Walters* v. *State*, 183 Ind. 178, 108 N.E. 583; *State* v. *Johnson*, 92 Kan. 441, 140 Pac. 839; *State* v. *Green*, 78 Utah 580, 6 P.2d 177. Sin embargo, una vez que en la causa existe prueba capaz de crear esa duda, la presunción de que el acusado estaba en su sano juicio en el instante de perpetrar el acto, queda rebatida y el

ministerio fiscal obligado a probar el sano juicio al igual que cualquier otro hecho.   El juzgador, con vista de toda la prueba presentada en cuanto al acto imputado y a la locura, tiene entonces la obligación de determinar si el ministerio fiscal ha probado la sanidad mental del reo, su capacidad para delinquir, y si al hacerlo encuentra que tiene duda razonable sobre ello, su deber es dar el beneficio de esa duda al inculpado y absolverle, *Martz* v. *People*, 114 Colo. 278, 162 P.2d 408; *Britts* v. *State*, 158 Fla. 839, 30 So.2d 363; *People* v. *Jenko*, 410 Ill. 478, 102 N.E.2d 783; *Limp* v. *State*, 228 Ind. 361, 92 N.E.2d 549; *People* v. *Eggleston*, 186 Mich. 510; 152 N.W. 944; *Williams* v. *State*, 205 Miss. 610; 39 So.2d 3; *State v. Moore*, 42 N.M. 135, 76 P.2d 19; *Gallagher* v. *State*, 81 Okla. Crim. 15, 159 P.2d 562.([6])

([6]) En *Pueblo* v. *González*, 69 D.P.R. 574, nos expresamos así, refiriéndonos a la defensa propia:

"Al que invoca la legítima defensa incumbe presentar la prueba en su apoyo, a menos que de la del fiscal surja dicha defensa.   Es al fiscal, sin embargo, a quien en todo momento del proceso incumbe probar la culpabilidad del acusado más allá de duda razonable.   El acusado no está en la obligación de probar la defensa propia más allá de duda razonable sencillamente porque si así fuera, se le estaría exigiendo que probase su inocencia, y todo acusado se presume inocente hasta que se pruebe su culpabilidad.   En consecuencia, bastará que la evidencia en apoyo de la defensa propia considerada conjuntamente con toda la prueba, lleve a la mente del jurado *duda razonable* de si el acusado actuó en defensa propia, para que exista el deber de darle el beneficio de esa duda y traer un veredicto de no culpable.   *De Groot* v. *United States*, 78 F.2d 244 (C.C.A. 9th. 1935); *Frank* v. *United States*, 42 F.2d 623 (C.C.A. 9th. 1930)."

Y en *Pueblo* v. *Carrero*, 71 D.P.R. 606, dijimos, con respecto a la defensa de coartada que:

"No cabe duda que las dos instrucciones trasmitidas antes transcritas, en lo que se refieren a la duda razonable en relación con la defensa de coartada, son erróneas y perjudicaron los derechos sustanciales del acusado. Este tenía derecho a que se le diera el beneficio de la duda en caso de que una duda razonable surgiera en la mente del jurado con respecto a si el acusado estaba o no en el sitio de los sucesos en el momento en que se cometió el delito.   Por la misma razón erró al no trasmitir la instrucción especial solicitada por el acusado.   *Reavis* v. *United States*, 93 F.2d 307 (C.C.A. 10, 1937); *People* v. *McCoy*, 153 P.2d 316 (Cal. 1944); *Goodall* v. *United States*, 180 F.2d 397 (C.A., D.C.1950); *People* v. *Intersimone*, 266 App. Div. 280 (N.Y. 1943); Cf. *Pueblo* v. *González*, 69 D.P.R. 574."

La norma de prueba que repudiamos en esta opinión se debe en gran parte al temor de que siendo la locura una condición que puede simularse fácilmente, a ella es posible que se recurra por los delincuentes como puerta de escape para quedar exentos de castigo, argumento que hoy es de valor muy cuestionable, como acertadamente dice Weihofen, dado el estado actual de los conocimientos en el campo de la psiquiatría, y que como razonamiento de carácter jurídico ha sido totalmente descartado por el Tribunal Supremo de Estados Unidos. Weihofen, *Mental Disorder as a Criminal Defense*, pág. 220. Lo hizo así dicho Tribunal en las siguientes palabras, muy elocuentes por cierto: [7] "Nos parece que se le dá demasiada importancia en algunos casos, al hecho de que, en procesos por asesinato, se recurra con frecuencia a la defensa de locura, sostenida por evidencia de expertos ingeniosos cuyas teorías son difíciles de refutar. Por eso se dice que crímenes de carácter execrable quedan a menudo sin castigo y que la seguridad pública por ello corre peligro. Pero la posibilidad de tales resultados siempre tiene que acompañar a todo sistema ideado para...castigar el crimen, y no debe inducir a los tribunales a apartarse de principios fundamentales de derecho penal, el reconocimiento y cumplimiento de los cuales es exigido por consideraciones de humanidad y justicia. Nadie debe ser privado de su vida bajo formas de ley, a menos que los jurados que le juzguen puedan, como cuestión de conciencia, decir que la evidencia ante ellos . . . , es suficiente para demostrar más allá de duda razonable la existencia de todo hecho necesario para que exista el delito imputado".

La doctrina que impone al inculpado el peso de probar su falta de cordura ha sido igualmente desechada por la Corte Suprema de Estados Unidos en *Davis* v. *United States*, supra, por las cortes del Distrito de Columbia y por los tribunales

---

[7] *Davis* v. *United States*, supra.

de Arizona, Colorado, Connecticut, Florida, Idaho, Illinois, Indiana, Kansas, Massachusetts, Michigan, Mississippi, Nebraska, New Hampshire, New Mexico, New York, Oklahoma, Tennessee, Utah, Vermont, Wisconsin y Wyoming, entre otros, y va perdiendo prosélitos a medida que transcurren los años. A ese respecto dice Weihofen a la pág. 238 de su citada obra, que "Ha habido una diferencia decidida de opinión con respecto a la tendencia de las jurisdicciones americanas hacia una u otra de las reglas relacionadas con el peso de la prueba", añadiendo que "Un examen de los casos y estatutos revela que la tendencia ha sido, y todavía es, la de requerir una cantidad menor de evidencia para que el acusado tenga derecho a que se le absuelva por razón de locura".

Nadie niega que la incapacidad para delinquir exime de castigo. Esto lo reconocen las legislaciones de todos los pueblos civilizados. Aunque por suerte la condición normal es la del sano juicio, la realidad de la vida desgraciadamente demuestra que el ser humano no siempre es cuerdo y que a veces sucumbe víctima de la demencia, que puede llevarlo y que en ocasiones lo lleva, a perpetrar actos contrarios a la ley. Es absurdo y ciertamente injusto el admitir esa realidad para después imponer trabas que destruyen el valor de la locura como eximente, motivadas en parte, bien por el temor, como hemos indicado, de que se recurra a la falta de capacidad mental, simulando la demencia, o bien por el peligro de que un veredicto absolutorio deje en libertad a quien pueda constituir una amenaza social, peligro que de existir aquí, y valdría la pena que se hiciera una revisión de nuestra legislación para determinar si existe, puede conjurarse fácilmente como lo ha sido en todos los Estados, mediante disposiciones en virtud de las cuales el acusado que es absuelto por razón de locura no queda automáticamente en libertad, sino que es recluído en una institución para dementes, en donde permanece hasta que puede ser restituído a la vida normal

sin peligro.(⁸) De todos modos, esos temores no pueden justificar que se conculquen principios fundamentales y básicos de justicia, que como la presunción de inocencia, constituyen verdaderas garantías de la seguridad individual.

██ ██ Para orientación de la Sala de instancia, ya que el proceso por asesinato ha de verse de nuevo, pasamos a considerar la cuestión que se plantea en el tercer señalamiento, en el que se impugna la siguiente instrucción trasmitida al jurado: "La falta de capacidad mental, para que exima de responsabilidad en la comisión de un delito debe ser una perturbación tan grande de las facultades mentales que inhiba el sentido del bien y del mal con relación al acto ejecutado al tiempo de su perpetración. Debe existir una ausencia de conocimiento de que un acto *es malo en su sentido moral o legal,* a fin de eludir la responsabilidad criminal". (Bastardillas nuestras.)

Sostiene el apelante que la fórmula "que establece la ley para determinar la responsabilidad criminal del demente es si tiene conocimiento del acto en su sentido moral y no en su sentido legal...", y que en vista de ello la corte a quo erró al incluir el desconocimiento de que el acto era malo por ser contrario a la ley. Basa su contención en las siguientes disposiciones del art. 39 del Código Penal: "Todas las personas son capaces de cometer crímenes, excepto las pertenecientes a las siguientes clases: ... 4. Lunáticos. Los lunáticos o locos; pero la propensión mórbida a cometer actos prohibidos en una persona cuya incapacidad para conocer la maldad de tales actos fuere imposible de probar, no podrá alegarse para dejar de perseguirle por ellos." Tales preceptos en efecto incorporan la llamada regla del bien y el mal de

---

(⁸) Weihofen en su obra sobre *Mental Disorder as a Criminal Defense,* pág. 365 y siguientes, hace un resumen de las medidas legislativas adoptadas en los Estados para evitar el peligro a que hemos aludido, y manifiesta que "cuando un acusado es absuelto por razón de irresponsabilidad mental, las leyes proveen ciertos pasos que deben darse para garantizar su reclusión como persona demente", añadiendo que "En ningún sitio el procesado es simplemente puesto en libertad."

acuerdo con la cual el acusado es mentalmente irresponsable, si su razón, al perpetrar el acto que se le imputa, estaba afectada por la locura hasta el extremo de encontrarse incapacitado para distinguir entre el bien y el mal, con respecto a dicho acto, esto es, para conocer la maldad del mismo.

Esa es la regla que predomina en la gran mayoría de los Estados, (⁹) no obstante haber continuado siendo objeto de críticas acerbas, acentuadas en los últimos años, quizás debido a la creencia de que a pesar de sus defectos, no es posible encontrar otra mejor, criterio del que discrepan muchos juristas y psiquiatras y del que han diferido algunos tribunales, entre ellos hace muchos años, el Tribunal Supremo de New Hampshire, *State* v. *Pike*, 49 N.H. 399; *State* v. *Jones,* 30 N.H. 360, y la Corte de Apelaciones de los Estados Unidos para el Circuito del Distrito de Columbia, *Durham* v. *United States*, 214 F.2d 862, resuelto en 1954, mediante opinión que constituye, sin duda alguna, aportación de valor extraordinario para el estudio del problema a que aludimos. (¹⁰)

---

(⁹) Ha sido liberalizada en un número de ellos, reconociéndose como factor eximente de responsabilidad el impulso irresistible causado por enfermedad mental. Nuestra legislación no lo reconoce, lo que aparentemente no está justificado en vista de las verdades reveladas por los adelantos en el campo de la psiquiatría.

(¹⁰) El Tribunal Supremo de New Hampshire ha rechazado todas las fórmulas legales para determinar la responsabilidad mental, decidiendo que la cuestión de responsabilidad o irresponsabilidad es una de hecho para el jurado, y que la única regla que puede comunicársele a éste es la de que si el procesado sufría de una enfermedad mental y el acto imputádole fué producto de ella, procede que se le absuelva. Este criterio descansa en el principio de que la responsabilidad requiere intención culpable y un acto prohibido.

En el caso de *Durham* v. *United States,* supra, el Juez Bazelon, autor de la opinión, censura la norma del bien y el mal por razones que impresionan hondamente, aunque no todas sean nuevas. Concluye que dicha fórmula no ofrece indicio adecuado para determinar la capacidad de delinquir, estando "basada en conceptos obsoletos y confusos en cuanto a la naturaleza de la locura". Expone que "la ciencia de la psiquiatría, ahora reconoce que el hombre es una personalidad integrada y que la razón, que es tan sólo un elemento de esa personalidad no es el único factor determinante de su conducta", añadiendo, "Que el criterio del bien y el mal, que consi-

Ya que la norma para determinar la responsabilidad mental, está establecida legislativamente en Puerto Rico, a ella tenemos que atemperarnos al considerar y resolver la cuestión que suscita el señalamiento.

El apelante en realidad arguye que si en un proceso criminal el acusado descansa en la ausencia de sano juicio como eximente de responsabilidad, basta con que la prueba demuestre que desconocía por razón de su locura, que el acto que perpetraba era moralmente malo, para que proceda su absolución, sin que el conocimiento o desconocimiento de que el acto era contrario a la ley tenga importancia alguna. No podemos estar de acuerdo con esa tesis, en vista de las disposiciones del art. 39 del Código Penal, que necesariamente nos llevan a la conclusión de que la insanidad mental que exonera de castigo, según nuestra legislación, es aquélla que impide que el actor conozca la maldad del acto que comete

dera el conocimiento o la razón solamente, es por tanto índice inadecuado para determinar la responsabilidad mental por conducta punible".

Pasamos a transcribir lo siguiente, de la opinión dictada en este caso: "La regla que resolvemos que debe ser aplicada en el nuevo juicio de este caso y en casos futuros no es distinta a la seguida por la corte de New Hampshire desde 1870, y es simplemente al efecto de que un acusado no es responsable criminalmente si su acto ilegal fué producto de enfermedad mental o defecto mental.

"Usamos 'enfermedad' en el sentido de una condición considerada capaz de mejoramiento o de deterioro. Usamos 'defecto' en el sentido de una condición que no es considerada capaz de mejoramiento o deterioro y que puede ser congénita, o el resultado de lesión, o el efecto residual de enfermedad física o mental...................................

.............................................................

"No estamos formulando, ni podemos hacerlo, una instrucción que sería apropiada y obligatoria en todos los casos, pero bajo la regla que enunciamos ahora, cualquier instrucción deberá en alguna forma comunicar al jurado el sentido y substancia de lo siguiente: Si...el jurado cree más allá de duda razonable que el acusado no estaba sufriendo de una enfermedad o defecto mental cuando perpetró el acto punible que se le imputa, ...puede declararle culpable. Si...creéis que estaba sufriendo de una condición de enfermedad o defecto mental cuando realizó el acto, pero creéis más allá de duda razonable que el acto no fué producto de tal anormalidad, podéis encontrarlo culpable. A no ser que creáis más allá de duda razonable, bien que no estaba sufriendo de una condición de enfermedad o defecto mental o que el acto no fué producto de tal anormalidad, debéis declarar al acusado no culpable por razón de locura. Por tanto, vuestra

como acto prohibido por la ley. El citado artículo preceptúa, como se ha visto, que "la propensión mórbida de cometer *actos prohibidos* en una persona cuya incapacidad para conocer *la maldad de tales actos*, fuere imposible de probar, no podrá alegarse para dejar de perseguirle por ellos". (Bastardillas nuestras.) Es incuestionable que el Código se refiere al desconocimiento de la maldad del hecho inhibido por ley, contrario a ésta. El precedente judicial que invoca el acusado, la decisión en *People* v. *Schmidt*, 216 N.Y. 324, 110 N.E. 945, en la que lo que al fin se resolvió fué que, *"hay ocasiones y circunstancias* en las que la palabra 'mal' tal como se usa en la fórmula estatutaria de responsabilidad (refiriéndose a la ley de Nueva York) *no debe* quedar *limitada* al mal legal"*, no puede hacernos cambiar de criterio.([11]) (Bastardillas nuestras.)

Tanto los autores como los tribunales difieren en cuanto al significado de la palabra "mal" usada en relación con la

labor no estaría completa por el hecho de determinar, si en efecto determináis, que el acusado sufría de una enfermedad o defecto mental. Él sería todavía responsable de su acto ilegal de no haber conexión causal entre tal anormalidad mental y el acto. Esas cuestiones deben ser determinadas por vosotros con vista de los hechos que encontréis que son razonablemente deducibles del testimonio y la prueba en este caso."

Tanto las decisiones de New Hampshire, así como la dictada en el caso de Durham, tiene favorecedores y detractores, pero difícilmente puede hacerse caso omiso de ellas en el evento de que se revise nuestra legislación en cuanto concierne a la fórmula para determinar la responsabilidad mental. Con relación a la doctrina que prevalece en New Hampshire, véase *Mental Disorder as a Criminal Defense*, Weihofen, pág. 113, y en cuanto a ambas, la obra del Juez John Biggs, Jr., titulada *The Guilty Mind*. En lo que respecta a la opinión en el caso de Durham, es de mucho interés el artículo del Juez Simon E. Sobeloff, publicado en 41 American Bar Association Journal, pág. 793.

Cf. *United States* v. *Smith*, 5 U.S.C.M.A. 314.

([11]) Una de las razones que esgrimen los que atacan la regla del bien y el mal es la de que los estudios y adelantos en el campo de la psiquiatría demuestran que un enfermo mental puede cometer un acto antisocial, por razón de su locura, a pesar de saber que es contrario a la ley. Sin embargo, es también posible que lo lleve a efecto sabiendo que es malo en su sentido moral. Es decir, que el defecto que apuntan los detractores de la norma no quedaría obviado, por lo menos totalmente, con simplemente extender o limitar el desconocimiento de la maldad del acto a su sentido moral.

norma para determinar la responsabilidad mental, y es aparentemente inútil el tratar de reconciliar las diferencias. De todos modos, no hay necesidad alguna de intentarlo, toda vez que nuestra conclusión sobre el significado de dicha palabra se basa en la interpretación que damos al art. 39, supra. No está demás el añadir, sin embargo, que aquélla concuerda con el criterio expresado por la Corte de Apelaciones Criminales (de Inglaterra) en el año 1952. Nos dice Weihofen en su obra *Mental Disorder as a Criminal Defense*, pág. 78, que dicho tribunal resolvió que no tenía duda de que la palabra "mal", "significa contrario a la ley, y no 'mal' de acuerdo con la opinión de un hombre o de un número de personas acerca de la cuestión de si un acto determinado podría o no estar justificado".

Por las razones expuestas, y sin aludir a los otros errores apuntados, por ser innecesario, *procede que se revoque la sentencia dictada en la causa por asesinato y se devuelva la misma al tribunal de instancia para la celebración de un nuevo juicio de acuerdo con los principios establecidos en esta opinión.* Aunque el apelante, como ya hemos dicho, no discute en su alegato las apelaciones en los casos de portar armas e infracción a la ley sobre registro de armas, en vista de que estamos estableciendo por primera vez la norma que debe regir con relación al peso de la prueba cuando en un proceso está envuelta la locura como eximente de responsabilidad criminal, *procede en bien de la justicia, que también se revoquen las sentencias pronunciadas en dichos casos, resueltos bajo una teoría equivocada de la ley, y que igualmente sean devueltos a dicha corte para la celebración de nuevo juicio.*

---

Opinión concurrente del Juez Asociado Sr. Marrero en la cual concurre el Juez Asociado Sr. Negrón Fernández.

Concurro en la opinión del Tribunal. Discrepo, sin embargo, de sus razonamientos por los motivos que paso a exponer en seguida:

Conforme se indica en la opinión de la mayoría, hay una fundamental discrepancia en el criterio jurisprudencial con relación a la norma de prueba que debe regir los casos en que el acusado descansa.en la defensa de locura.

La regla—originada en Inglaterra—que rige tanto en California como en unos veinte estados de la Unión Americana, es al efecto de que probados por el ministerio público los hechos en que funda su acusación, corresponde al acusado, si descansa en la defensa de locura, ofrecer prueba para establecer, por una preponderancia de la evidencia, dicha defensa. *Leland* v. *Oregon*, 343 U.S. 790, 798, 96 L.Ed. 1302; *People* v. *Willard*, (Cal.), 89 Pac. 124; *People* v. *Chamberlain*, (Cal.), 60 P.2d 299; *People* v. *French*, (Cal.), 87 P.2d 1014, 1021; *People* v. *Sloper*, (Cal.), 244 Pac. 362; *People* v. *Williams*, (Cal.), 194 Pac. 1019; *People* v. *Hickman*, (Cal.), 268 Pac. 909; Weihofen, *Mental Disorder as a Criminal Defense*, pág. 212. El ministerio público puede o no presentar entonces prueba de refutación, (véase *People* v. *Chamberlain*, supra), pero en uno u otro caso corresponde al juzgador de los hechos —jurado o tribunal—determinar si el acusado razonablemente ha probado que al momento de la comisión del acto que se imputa, estaba loco. En ese momento el juzgador debe determinar, por preponderancia de prueba, (1) si tal defensa ha quedado establecida.

Dicha regla se funda en que la sanidad mental del acusado no es un ingrediente del delito, sino una condición previa a una actuación inteligente; una cualidad del actor, no un elemento del acto realizado. *State* v. *Quigley*, 26 R.I. 263, 58 Atl. 905.(2) Parte de la base de que la condición normal

---

(1) Oregón se aparta de esa regla, siendo el único estado de la unión americana que exige que la defensa de locura sea probada por el acusado más allá de toda duda razonable. *Leland* v. *Oregon*, 343 U.S. 790, 798.

(2) En *State* v. *Quigley*, 26 R.I. 263, 58 Atl. 905, se dice en el curso de la opinión:

"La regla inglesa sugiere que la cuestión de culpabilidad y la cuestión de locura levantan dos controversias distintas y que si bien ambas pueden estar envueltas en el veredicto final que se rinda, el peso de probar cada una de esas cuestiones recae sobre los hombros de distintas personas. La

del ser humano es la del sano juicio, y que únicamente se exime de responsabilidad criminal a aquél que realiza el acto padeciendo de enajenación mental, por lo cual incumbe a éste probar ese estado, y así demostrar que los ingredientes del delito no podían existir en su mente al momento de su comisión.

La otra regla, que es la federal—*Davis* v. *United States*, 160 U.S. 469, 40 L.Ed. 499—es al efecto de que, correspondiendo al ministerio público probar la culpabilidad del acusado fuera de toda duda razonable, a él incumbe también probar la capacidad del acusado para cometer el delito; y de que si bien el ministerio público puede, al presentar su caso, descansar en la presunción de cordura, tan pronto la defensa presenta prueba de locura dicha presunción queda destruída, debiendo cumplir entonces el ministerio público su obligación de presentar prueba de cordura. En ese momento el juzgador debe determinar, según esa regla, si el ministerio público ha probado la sanidad mental del acusado fuera de toda duda razonable. Si el ministerio público no ofreciere prueba sobre cordura, siempre debe determinar, tomando en consideración tanto la presunción de sanidad mental como la prueba de locura del acusado, si éste estaba cuerdo, fuera

manifestación más completa y más convincente del argumento en apoyo de esta regla que hemos podido hallar está contenida en la opinión emitida por el Juez Danforth en el caso de *State* v. *Lawrence*, 57 Me. 574, 581. La llamada regla americana sostiene que en una causa criminal sólo existe una controversia y que a través de todo el juicio al estado incumbe probar no sólo el acto criminal sino también la capacidad del acusado para cometerlo fuera de toda duda razonable.

"Creemos que la primera de estas posiciones es la más lógica. La sanidad mental del acusado no es un ingrediente del delito, es una condición previa a una actuación inteligente, ya sea ésta benévola o nefaria. Es una cualidad del actor, mas no un elemento del acto realizado. Incumbe al ministerio público probar la comisión del acto, y de la prueba que ofrezca con sus circunstancias, sostener la inferencia de malicia y de aquellas emociones que el delito específico puede comprender. Sin embargo, la sanidad mental del acusado no es una de esas inferencias. Es un hecho preexistente que puede considerarse implícito tanto en derecho como en la experiencia general... Se ha argüido que la intención criminal, la malicia y la premeditación son hechos a ser probados por el estado; que aquéllas no pueden existir en un loco; y por tanto, que la sanidad mental del acusado debe ser probada por el ministerio público. Empero éstos son

de toda duda razonable, y si existiere ésta, debe darle el beneficio de dicha duda. Véase, además, Wigmore *on Evidence*, Vol. IX, tercera ed., sec. 2501, págs. 359 y siguientes, y suplemento de 1955, págs. 117 y 118.

Creo que la más sabia y la que más se ajusta a nuestro derecho es la primera de las reglas antes expuestas. Según ella, al acusado incumbe probar la defensa de locura con preponderancia de prueba. Preponderancia de prueba es aquella prueba que al ser justipreciada por el juzgador junto a la ofrecida por la parte contraria, resulta la más convincente y la que mayores probabilidades tiene de ajustarse a la verdad, Caljic, sec. 801, pág. 630; *cf. Irizarry* v. *Trujillo*, 16 D.P.R. 20.(³) Si bien se ha resuelto que preponderancia de prueba no es una frase legal y que no siéndolo no comete error perjudicial un tribunal al no definir la misma al jurado en sus instrucciones—*People* v. *Williams*, supra; *Maryland Casualty Co.* v. *Boverie*, (Texas), 37 S.W.2d 310, 312; *Jones* v. *Durham*, (Mo.), 67 S.W. 976, 977—mi criterio es que al instruirse al jurado debe definirse esa frase, a fin de que los juzgadores de hechos tengan una idea, más o menos precisa, del alcance y significado de la misma.

---

hechos relacionados con el estado mental y con la actuación del acusado, que sólo pueden ser probados mediante inferencias de hechos, circunstancias y actos materiales. Por tanto, incumbe al ministerio público probar aquellos hechos, circunstancias y actos materiales que compelerían al jurado a·inferir la culpabilidad de una persona cuerda; ahí termina la obligación del estado. En casos de asesinato el ministerio público debe establecer el hecho de la muerte, y bien mediante inferencia o prueba adicional, la malicia y la premeditación. Si estos ingredientes del delito no pueden existir sin una mente cuerda ésta se presume. Todos los ingredientes del delito deben ser probados, y estamos de acuerdo en que en cuanto a éstos el peso de probarlos nunca cambia. Pero al estado nunca le incumbe probar la sanidad mental del acusado. La alegación de no culpable por sí sola no suscita la cuestión de la sanidad mental del acusado. Todos están de acuerdo en que esta cuestión debe ser planteada por él en otra forma, bien mediante alegación especial o por lo menos ofreciendo prueba al efecto, lo que equivale a confesar la comisión del delito y a sostener que no obstante tal confesión no se es culpable de su comisión (*confession and avoidance*)."

(³) Para definiciones adicionales de la frase "preponderancia de prueba" véase 33 Words & Phrases, edición permanente, págs. 389, 392 y siguientes.

A pesar de que el Pueblo no produjo prueba directa para destruir las declaraciones de los peritos médicos ofrecidos por la defensa con el propósito de demostrar la locura del acusado, la presunción de cordura de que habla el art. 12 del Código Penal(⁴) es tan fuerte que de no ser rebatida, la misma es considerada como suficiente para demostrar que el acusado se hallaba en su sano juicio al momento de cometer el delito. Weihofen, ob. cit., págs. 214 *et seq.* *Cf.* 16 So. Cal. L. Rev. 245. En Puerto Rico, tal presunción, al igual que toda otra presunción, constituye evidencia. Así lo disponen expresamente los arts. 96, 102 y 162 de la Ley de Evidencia (arts. 458, 464 y 524 del Código de Enjuiciamiento Civil de Puerto Rico, ed. de 1933), 32 L.P.R.A. secs. 1881, 1887 y 1679—*Cf. Acevedo* v. *Sucn. Caballero,* 9 D.P.R. 424, 430. Los arts. 96, 102 y 162, supra, disponen en lo esencial:

"(Art. 96) La evidencia indirecta es de dos clases:
"1. Inferencias; y
"2. *Presunciones.*"
"(Art. 102) Todas las demás presunciones serán satisfactorias, si no fueren contradichas. Se denominan presunciones disputables y pueden controvertirse mediante otra evidencia. . . ."
"(Art. 162) . . . El tribunal o jurado no está obligado a decidir de conformidad con las declaraciones de cualquier número de testigos, que no llevaren a su ánimo la convicción, contra un número menor o una *presunción u otra evidencia* que le convenciere." (Bastardillas nuestras.)

Así también se ha resuelto en innumerables casos por el Tribunal Supremo de California interpretando los arts. 1957, 1963 y 2061 del Código de Enjuiciamiento Civil de dicho estado, que son idénticos a los nuestros antes citados. *People* v. *Chamberlain,* supra; *Smellie* v. *Southern Pac. Co.,* 299

---

(⁴) El art. 12 del Código Penal, 33 L.P.R.A. sec. 33, dispone en parte que "se reputan de sano juicio todos los que no sean idiotas, lunáticos o locos."

Pac. 529; *Mar Shee* v. *Maryland Assur. Corp.*, 210 Pac. 269, y casos en ellos citados. (⁵)

Las declaraciones de los peritos sobre la insanidad mental del acusado han de ser aquilatadas por los señores del jurado teniendo presente esa presunción, no siendo tales declaraciones obligatorias para éstos. *Pueblo* v. *Dones*, 56 D.P.R. 211, 222; *People* v. *Willard*, supra; *People* v. *Denningham*, (Cal.), 185 P.2d 614; *People* v. *Gilberg*, (Cal.) 240 Pac. 1001; *People* v. *Darling*, (Cal.), 237 P.2d 691. La norma seguida en casos de esta naturaleza siempre ha sido si al momento de cometer el delito el acusado tenía capacidad para distinguir entre el bien y el mal. *Leland* v. *Oregon*, supra; *People* v. *Sloper*, supra. (⁶)

En sus extensas instrucciones al jurado el tribunal manifestó, como se ha visto, entre otras cosas que: "los hechos alegados por el fiscal han de probarse fuera de toda duda razonable, *los alegados por la defensa en este caso específico han de ser probados con una preponderancia de la prueba;* . . . El acusado ha alegado que él si bien dió muerte a la persona

---

(⁵) En *People* v. *Chamberlain*, 60 P.2d 299, 300, el Tribunal Supremo de California se expresó así:

"Ningún testigo declaró que el acusado estaba cuerdo al momento de cometer el delito. El ministerio público sometió su caso sin ofrecer prueba de clase alguna para refutar el caso del acusado sobre la cuestión de sanidad mental. Descansó enteramente en la presunción legal de que se presume que toda persona es cuerda, y en la evidencia, de haberla, tendiente a demostrar la cordura del acusado aducida al repreguntarse a los testigos de la defensa, incluyendo al propio acusado que declaró en su beneficio.

"..

"...Desde hace mucho tiempo, ha sido la ley establecida en este estado que una presunción constituye evidencia y puede en ciertos casos contrarrestar evidencia afirmativa aducida en su contra."

El caso de *Quiñones Carrasquillo* v. *Quiñones*, 42 D.P.R. 307, 312, a mi juicio debe ser expresamente revocado, en tanto en cuanto puede interpretarse como que resuelve lo contrario en materia de presunciones.

(⁶) El apelante también sostiene que el tribunal sentenciador "erró al instruir al jurado que debe existir una ausencia de conocimiento de que un acto es malo en su sentido moral..." A mi juicio no tiene razón. La locura moral no constituye defensa alguna en causas criminales. *People* v. *Gilberg*, supra. *People* v. *McCarthy*, 46 Pac. 1073.

a que se refiere la acusación e intentó contra la vida de otro ser humano, él no es culpable, porque al realizar esos hechos lo hizo estando incapacitado mentalmente, o sea, que él es inocente porque no distinguía entre el bien y el mal al realizar esos hechos, y era demente.  La ley exime de responsabilidad criminal a los locos, dementes, lunáticos e idiotas, a una persona que está enferma mentalmente, que no sabe lo que está haciendo cuando comete un acto delictivo, que no puede distinguir si ese acto es bueno o malo; y la ley lo considera exento de responsabilidad y por tanto es el deber del jurado si entiende que el acusado estaba en esas condiciones en el momento de cometer esos hechos, declararlo no culpable.  O sea, todas las personas son capaces de cometer delitos, excepto los idiotas, lunáticos o locos.  Los señores del jurado juzgarán si se han probado esas circunstancias que demuestren que el acusado estuvo loco en el acto en que se cometió el delito, que estuvo loco en el momento de cometer esos hechos. ...es una defensa a la que se recurre a veces sin justificación, en casos en que se ofrece prueba tan completa que hace infructuosa la presentación de cualquier prueba u otra clase de defensa; pero tampoco debe ser considerada como una defensa artificiosa y engañosa; y *"ésa (la de locura) es una defensa real cuando se prueba fuera de toda duda por una preponderancia de la prueba,* que el acusado estaba padeciendo de una enfermedad mental que lo incapacitaba en el momento de cometer los actos por los que se le acusa."  (Bastardillas nuestras.)

Cuando el tribunal finalizó de dar sus instrucciones la defensa manifestó: "una excepción en todas y cada una de las instrucciones y especialmente las instrucciones que se refieren a los grados del delito y la separación de veredictos en relación con los delitos imputádosle."  En ningún momento la defensa solicitó que se dieran instrucciones específicas sobre determinado extremo o que se corrigieran las instrucciones ya dadas.  Este Tribunal ha resuelto repetidamente

que una excepción general a las instrucciones no protege ningún supuesto error en apelación, y que es menester anotarse .excepciones específicas.([7])   Véanse *Pueblo* v. *Rodríguez*, 70 D.P.R. 23; *Pueblo* v. *Piazza*, 60 D.P.R. 575, 585; *Pueblo* v. *Mediavilla*, 54 D.P.R. 565; *Pueblo* v. *Cardona*, 50 D.P.R. 108, 112; *Pueblo* v. *Quirós*, 48 D.P.R. 962, 966; *Pueblo* v. *Mercado*, 46 D.P.R. 152, 157; *Pueblo* v. *Varela*, 42 D.P.R. 823; y la opinión *per curiam* dictada en *Pueblo* v. *Ayala Martínez* en 27 de diciembre de 1954 y la de *Pueblo* v. *Vélez*, 77 D.P.R. 817; así como *United States* v. *Daily*, 139 F.2d 7, 9; *Du Vall* v. *United States*, 82 F.2d 382, 383 (certiorari denegado en 298 U.S. 667) ; *Huffman* v. *State*, 259 S.W.2d 509, 510; *Garver* v. *State*, 258 S.W.2d 812, 816; *Commonwealth* v. *Ransom*, 82 A.2d 547, 551.   Mas también ha resuelto en reiteradas ocasiones que no obstante el hecho de no haberse tomado por el acusado excepciones específicas a las instrucciones dadas al jurado, el Tribunal puede conocer en apelación de errores fundamentales cometidos por el tribunal sentenciador al trasmitir las mismas.   *Pueblo* v. *Rodríguez*, supra; *Pueblo* v. *Belardo*, 50 D.P.R. 512, 519; *Pueblo* v. *Cardona*, 50 D.P.R. 108; *Pueblo* v. *Hernández*, 49 D.P.R. 419; *Pueblo* v. *Benítez*, 47 D.P.R. 78; *Pueblo* v. *Maldonado*, 45 D.P.R. 417; *Pueblo* v. *Ramírez de Arellano*, 25 D.P.R. 263.([8]) Al así proceder lo ha hecho de conformidad con la Ley de 30 de mayo de 1904, que aparece inserta a continuación del art. 362 del Código de Enjuiciamiento Criminal, ed. de 1935, cuyo artículo primero reza así:

"Siempre que resultare de los autos, en alguna causa criminal apelada a la Corte Supremà, que cualquier requisito legal

---

([7]) De haberse anotado excepciones específicas a las instrucciones y de haber dado el acusado oportunidad al tribunal para corregirse, es de presumirse que la instrucción errónea, que últimamente hemos mencionado, hubiese sido aclarada y corregida.   Cf. *Asgill* v. *United States*, 60 F.2d 776, 780; *United States* v. *Vasilaky*, 168 F.2d 191.

([8]) Véase también, *Fisher* v. *United States*, 328 U.S. 463, 90 L.Ed. 1382, 1386.

haya sido desatendido por el tribunal sentenciador, no se anulará la sentencia a menos que el error que de los autos resultare, tendiere a perjudicar los derechos de cualquiera de las partes, y se hubiere interpuesto la debida excepción en el tribunal sentenciador; *Disponiéndose, sin embargo, que el tribunal de apelación podrá conocer de errores fundamentales que aparecieren en los autos, aun cuando no se hubiere interpuesto objeción a ellos,* y fallar sobre los mismos con arreglo al derecho que de los hechos se desprendiere." (Bastardillas nuestras.)

El tribunal sentenciador, como se ha visto, originalmente trasmitió una instrucción en el sentido de que "los hechos alegados por la defensa en este caso específico, han de ser probados con una preponderancia de la prueba." Si nada más hubiera dicho sobre la forma en que ha de probarse la defensa de locura, nada habría que objetar a la instrucción. Empero, posteriormente el tribunal manifestó que la de locura "es una defensa real cuando se prueba *fuera de toda duda* por una preponderancia de la prueba." La adición de las palabras "fuera de toda duda" hizo que la instrucción resultara completamente equivocada, por cuanto desvirtuó el concepto correctamente expresado anteriormente sobre preponderancia de prueba. 14 Cal.Jur.2d, pág. 255. Por ser la última instrucción dada al respecto y por ser la que más fresca estaba en la mente de los señores del jurado, ella posiblemente indujo a éstos a creer que en verdad el acusado tenía que probar su defensa de locura "fuera de toda duda." Aunque el acusado sólo se anotó excepciones generales a las instrucciones y aunque discrepo del razonamiento de la opinión del tribunal respecto a la forma en que debe probarse la defensa de locura, el error así cometido es tan fundamental que convengo en que lo procedente es revocar las sentencias apeladas y ordenar la celebración de un nuevo juicio.