## JOSEPH EDWARD BRITTS v. STATE OF FLORIDA

30 So. (2nd) 363                              January Term, 1947
May 2, 1947                                         Division B
Rehearing Denied May 30, 1947

*Evan T. Evans,* for appellant.

*J. Tom Watson,* Attorney General, *Reeves Bowen,* Assistant Attorney General, and *Rebecca Bowles Marks,* Special Assistant Attorney General, for appellee.

BUFORD, J.:

Appeal brings for review judgment of conviction of assault with intent to commit manslaughter.

Two questions are presented in brief of appellant. We think the case may properly be disposed of by determination of appellant's first contention which is:

That appellant was so mentally deranged at the time of the commission of the act which he was charged with committing that he was not criminally responsible for his act.

The uncontradicted evidence is that for about ten days prior to Monday before the Tuesday evening on which the alleged assault occurred the appellant had been on a drunk. He arrived in Jacksonville from Charleston, S. C., on Monday night. Shortly after arriving in Jacksonville he decided to go back to his mother's home. He bought a bus ticket to take the next bus back. The bus was not due to leave until about 8:00 o'clock the next morning. He stayed in the bus station except for time spent in going across the street several times for coffee. He was in a very nervous condition. About morning he became obsessed with the belief that three sailors, who had come into the bus station, intended to do him bodily harm and became very much afraid of them. At about time for the bus to leave he approached a policeman, told him of his fears and asked the police-officer to go with him to the bus and see that he was not hurt. He then thought the sailors were going to kill him. The police officer told him that it was about time for him to go off duty. He then asked the police officer if he could walk with him from the bus station. As he was leaving the bus station with the policeman he saw some shore patrolmen and asked them to give him assistance. They told him they could not do anything as long as those fellows did not jump on him. He walked on down the street with the policeman. He then went to get on the bus but did not get on it because he saw the three sailors again and was still imbued with the notion that they intended to assault him. So he went out and inquired the way to get back on Main Street. It was his intention to go out on Main Street and catch the bus out there. He stopped by a filling station on Main Street and made inquiry as to when the next bus would be by going north. He stayed at the filling station sometime and then caught a city bus, which turned out not to be the one he intended to catch, and rode it out to the end of the line. When he got there he asked the driver how to get back to Main Street. He got on Main Street, stopped at a fruit stand and bought some cigarettes. He then saw a city patrol car, went over and told the man in the car what had happened to him and asked if he should go out to the edge of town to catch a bus or go back to the bus station. They advised him to go

back to the station. He did not do that but went back into the filling station, where he stayed until practically dark. There he became very much frightened again and ran away from there until he saw a place all lighted up; then he decided that he had better avoid that. So he ran back of the house where some dogs started barking at him. He climbed the fence and ran into the woods. When he came out of the woods he was in someone's back yard; he went to the back door, saw a man, woman and little girl in the house and hollered and asked if the man would take him back across the woods where he could catch a city bus. He then thought a crowd of people were out on the highway waiting for him and he asked this man and woman if he could hide in the house. They told him no and for him to get away from there. So he left that house. He saw cars on the highway and, thinking the people were after him, he waited until the cars got by and then ran across the road to another house. At the first house at which he saw a light he knocked on the door. Someone came to the door and he asked if they had a car and could take him to town where he could get a city bus. He told them that he thought the people were after him and were going to kill him and he asked these people to call the city police. These people observed that the man was very much frightened and appeared to believe himself in great danger. They allowed him to have a seat and gave him a drink of water. These people were Mr. H. E. Sergeant and his wife, Mrs. Sergeant. The Sergeants called the officers and County Road Patrolman Higginbotham and his riding partner Lee responded to the call and assured appellant that they would take care of him. After some parley he got into the car with them and they took him to the filling station where he had spent most of the afternoon and asked the man there about him. At this time he became very much afraid of the two patrolmen. He got out of the car at the filling station but they told him to get back into the car, which he did. They left that place and he thought they were taking him to the bus station. They soon stopped in front of a hotel and one of the patrolmen got out. He soon discovered that they were not taking him to the bus station. Then he jumped out of the car, diving out head first through the win-

dow, scrambled to his feet and ran. Patrolman Higginbotham ran after him and caught him and while he was taking him back to the car appellant grabbed Higginbotham's pistol and shot him twice. Appellant testified that he remembered absolutely nothing from the time he jumped out of the car until he had a dim recollection of a lot of people being crowded around him and he believed they were going to kill him. The next thing he appears to remember was that he found himself locked up. He says he remembers nothing about the shooting.

Two eminent physicians, both specialists in nervous and mental diseases, examined him sometime after this occurrence. They both testified in effect that after the examination, and getting his case history, it was their opinion that at the time of the incident he was suffering from alcoholic hallucinosis and that it was probable that a man would remember all that occurred while suffering those hallucinations up to a certain point where under great excitement he would become amnesic for a period and would remember nothing which happened during that period and yet begin to remember what occurred again after the amnesia had passed away.

All of appellant's conduct during the period testified about is shown to be consistent with his having been under alcoholic hallucinosis and entirely inconsistent with any other conclusion.

It, therefore, follows that the uncontradicted evidence, now shown to be inherently improbable, leads to the conclusion that the accused was at the time of the alleged assault mentally deranged, or temporarily insane and not criminally responsible for his conduct, although that condition was super-induced by the previous use of alcoholic liquor.

In Baldwin Century Edition of Bouvier's Law Dictionary we find it said:

"Legal insanity which exonerates from crime or incapacitates from civil action is a mental deficiency with reference to the particular act in question and not a general incapacity."

The presumption is that every person is sane until evidence is introduced to rebut that presumption.

In Armstrong v. State of Florida, 30 Fla. 170, 11 So. 618, it was said:

"The rule we recognize is, that when evidence is introduced which tends to rebut the presumption of sanity on the part of the accused, and the jury entertain a reasonable doubt, after considering all the evidence as to his sanity, it is their duty to acquit."

In Thompson v. State, 78 Fla. 400, 83 So. 291, it was said:

"The law, however, presumes that all men are sane, and in the absence of evidence indicating a contrary state of mind both court and jury are justified in acting upon this presumption; and where the evidence establishes the criminal act, and indicates nothing as to the mental capacity of the accused to commit the deed, a conviction is not only authorized but should be had. If, however, there arises from the evidence coming from any quarter, a reasonable doubt as to the sanity of the accused, the presumption of the law is overcome and he is entitled to an acquittal, unless the State meets and overcomes this reasonable doubt arising in his favor."

In Blocker v. State, 87 Fla. 128, 99 So. 250, it was said:

"The rule in this jurisdiction is that where from the evidence, whether adduced by the State or the Accused, there arises in the mind of the jury a reasonable doubt of defendant's sanity at the time of the alleged criminal act, the presumption of sanity is overcome and he should be given the benefit of such doubt and acquitted."

Upon the question of the weight to be given the testimony of a party to an action or any party directly interested in the event of the trial, there is some difference of opinion. In some cases it is held that the triers of facts, whether court or jury, are not justified in disregarding the uncontradicted testimony of an interested witness. Kelly v. Jones, 290 Ill. 375, 125 N.E. 334; Miller's Will 49 Ore. 452, 90 Pac. 1002. In affirming a judgment in favor of the defendants in a Wisconsin case tried by the court without a jury, the court, referring to the testimony of the defendants, said as to their interest:

"It is hardly necessary for us to remark that no court of jury would set aside or wholly ignore their testimony on this ground. If they are competent to testify at all to the facts,

the very law authorizing it implies that under such circumstances some faith and credit are to be given to their statements. No court or jury are authorized to say: 'These parties are interested and, therefore, without considering any other fact or circumstance, we will discredit them.' Daniels v. Foster, 26 Wisc. 686."

In Engmann v. Immel, 59 Wis. 249, 18 N.W. 182, it was held that the court properly charged the jury as to the testimony of the plaintiff's attorney:

"You have heard the testimony of Mr. Frisby about the note as to the genuineness of the signature. His testimony is uncontradicted, and unless there is something in the case which casts discredit on his testimony, you are bound to accept it as true."

In the case of Ironside v. Ironside, 188 Okla. 267, 108 P. (2) 157, it was stated as follows:

"Undisputed credit testimony not inherently improbable is generally binding on a court or jury, but evidence is not regarded as undisputed if it is at variance with the facts and circumstances of the case or reasonable inferences to be drawn therefrom."

See also Crockett v. State, 137 Fla. 450, 188 So. 214, and Holton v. State, 87 Fla. 65, 99 So. 244, wherein we said:

"The circumstances relied upon by the State to contradict the defendant's story are not so conclusive of the falsity of that story as to have warranted the conviction. If they had been sufficient to overcome defendant's story and refute it in detail it would have left the defendant with nothing to stand on but a practical confession of murder in the first degree; but the jury evidently was not satisfied with the sufficiency of the evidence offered by the State to justify a verdict of murder in the first degree."

In Flowers et al. v. State, 106 Fla. 686, 143 So. 612, we held:

"It is the province of a jury to reconcile conflicting evidence but where there is no conflict in the evidence a jury is not authorized to disregard the direct and positive evidence which shows that the defendants are not guilty of the offense charged."

While there is no evidence of intoxication at the time the act is alleged to have been committed by appellant, the condition was the result of drinking. We think, however, that it could not make much difference whether the temporary insanity is the immediate consequence of voluntary intoxication or is the deferred consequence of voluntary intoxication because the rule appears to be that where a person is too intoxicated to entertain or be capable of forming an essential or particular intent such intent cannot exist and consequently the offense of which it is a necessary element cannot be perpetrated. See Garner v. State, 28 Fla. 113, 9 So. 835, 29 Am. St. R. 232; Jenkins v. State, 58 Fla. 56, 50 So. 582; Cochran v. State, 65 Fla. 91, 61 So. 178; Crews v. State, 143 Fla. 263, 196 So. 590.

So it is, while we are reluctant to reverse the judgment based on the verdict of a jury, and especially so in cases where the alleged assault has been made upon an officer of the law, we are impelled to hold that the record in this case shows beyond any reasonable question that the appellant was not legally responsible for his acts at the time the assault was committed.

Therefore, the judgment should be, and is, reversed.

So ordered.

THOMAS, C. J., ADAMS and BARNS, JJ., concur.