101 So.2d 130 (1958)
Walter FARRELL, Appellant,
v.
STATE of Florida, Appellee.
Supreme Court of Florida.
March 12, 1958.
William T. Fussell, Tampa, for appellant.
Richard W. Ervin, Atty. Gen., and George R. Georgieff, Asst. Atty. Gen., for appellee.
*131 THOMAS, Justice.
The appellant was indicted and tried on a charge of murder in the first degree and was found guilty of murder in the second degree. Soon after the indictment was returned he filed an affidavit of insolvency and requested the court to appoint counsel to defend him. The attorney, appointed by the court pursuant to Sec. 909.21, Florida Statutes 1955, and F.S.A., presented to the court a petition for the designation of two disinterested qualified experts to examine the appellant and report on his mental condition, the attorney stating in the petition his belief that the appellant was suffering from "psycho-neurosis". The attorney represented that he had been unable to elicit from the appellant coherent answers to simple questions about the episode which resulted in the charge and concluded with the view that the appellant was insane.
The following day the circuit judge appointed two physicians to examine the appellant and fixed a day to receive the report and to hear such other testimony as might be presented on the question whether or not the appellant was "possessed of sufficient mental capacity to stand trial * * *." Upon motion of the state attorney the court ordered that all records held at MacDill Air Force Base relating to the appellant be made available to the doctors in order that the mental condition of the appellant could be properly evaluated.
One of the physicians, Dr. Samuel G. Hibbs, after repeating the sordid story of the relationship between the appellant and his former wife, whom he was charged with having murdered, as the appellant had related it to him, expressed the opinion that the appellant was legally sane at the time of the examination, but "insane at the time of the alleged offense." He qualified this opinion, however, by recommending, because of the seriousness of the offense charged, that the appellant should be further examined and reports of his examination at MacDill and Eglin Fields should be obtained, "before a conclusive answer is given as to his present mental status and his mental status at the time of the alleged offense." (Italics supplied.)
The other physician, Dr. Collin Baker, simply reported that he found the appellant "deeply emotionally disturbed" and "technically mentally ill," but that the appellant was not at the time of the examination, and "probably" was not, at the time of the commission of the alleged crime, legally incompetent.
It should be repeated now that these physicians were directed to furnish information from which the court could decide whether or not the appellant had "sufficient mental capacity to stand trial" and it should be noted that although the court undertook to make the records from MacDill Field available they had not at this time been seen by the former doctor. Whether or not the latter doctor had seen them is not discernible from his report.
Apparently no other evidence or testimony had been presented to the court when the circuit judge, reciting the appointment of the two physicians to determine the then mental condition of the appellant found that he "was sane * * * and * * * mentally capable of assisting his counsel and standing trial," on the serious charge of murder in the first degree.
An analysis of the reports of the two physicians with reference to appellant's sanity at the time of the examinations, on which alone the order of the court was based, demonstrates that they were most inconclusive on the subject of his mental capacity to collaborate with his attorney in the preparation and conduct of his defense. True, Dr. Hibbs said that in his opinion the appellant was not then insane but he counteracted the opinion to a certain extent with his recommendation that reports of air force doctors be considered and further psychological tests be made before a positive answer should be reached as to the present sanity of the appellant.
*132 Dr. Baker, too, seemed to qualify his opinion that the appellant was not legally incompetent at the time of his examination by stating that the appellant was "deeply emotionally disturbed" and "technically mentally ill."
Judging the contents of the written reports which, so far as we know constituted the only evidence before the circuit judge, we conclude that there was grave doubt of the ability of the appellant on the eve of his trial to cooperate in his defense against a charge which could have resulted in the forfeit of his life.
The appellant plead not guilty and not guilty by reason of insanity so his sanity became an issue during the trial and the judge charged the jury that even if it was found beyond a reasonable doubt that the appellant committed the act charged, it would be the jury's duty to acquit if they believed appellant had not "sufficient mental capacity to distinguish between right and wrong with respect to the particular act * * *." The verdict, of course, was a finding that the appellant was sane at the time of the homicide.
We go now to the testimony, introduced during the trial, bearing upon his sanity or insanity at the time of the commission of the alleged offense. And we bear in mind the comments of the two physicians about appellant's mental state at that period, although they had been charged only to determine it at the time they conducted their examinations. To repeat, one had stated: "* * * I am of the opinion that he [appellant] was insane at the time of the alleged offense" while the other had said that he "probably was not" legally incompetent when the crime was committed.
At the trial two physicians testified in appellant's behalf, one of whom was Dr. Hibbs. He expressed under oath, the opinion that from his examination of the appellant and the medical records from MacDill and Eglin Fields by then made available to him, as well as statements of the appellant himself, the appellant was temporarily insane at the time of the homicide, and he clung to the view and gave reasons for it throughout an extensive cross-examination by the state attorney.
The only other witness of this phase of the case was Dr. Louis S. Glickman, psychiatrist at MacDill Air Force Base. He told about his experience when the appellant had tried to kill himself about a year before and about appellant's hospitalization at MacDill and Eglin Fields, evidently at this physician's direction. He described appellant as a person who would lose control of himself "in an insane way," who suffered from thought disorder, who would totally misjudge his surroundings, who would lose his grip on reality, who when frustrated would keep things to himself "until he finally blows up and loses all control of himself," who was suffering from paranoid schizophrenia. During one interview the appellant regarded the witness as a police officer and pleaded the Fifth Amendment to questions about his age and the friendliness between himself and his wife showing utter lack of comprehension of the purpose of the consultation. In explaining the thought disorder, apparent during the interview, the appellant said "I'm not a patient. I ought to have some more patience." Then he started talking about the totally unrelated subject of "pennies". All this conversation bore no relevancy to the effort of the physican to determine why the appellant attempted to take his own life.
The description of appellant's personality given by the two physicians at the trial was harmonious to a remarkable degree. He was said to be a sufferer from paranoid schizophrenia who would occasionally lose control of himself "in an insane way," fail to differentiate between the real and the unreal, misidentify people and be confident he knew what he was doing when the immediate situation differed entirely from the one he thought was present. While Dr. Glickman said, as we have quoted him, that appellant would blow up and lose control *133 of himself, Dr. Hibbs commented he would "blow up to the point that he is definitely mentally sick" and that when he talked to his former wife immediately before her death he had "exploded into a temporary insane state" due to her taunts that he was sexually deficient.
Obviously appellant's condition had existed for a long period and one perusing the record would come inevitably to the conclusion that his temporary insanity might recur at any time. Under cross-examination by the state attorney, Dr. Hibbs reminded the state attorney that at a former hearing, when the doctor felt that the appellant was showing again signs of deteriorating, he had cautioned both the state attorney and the deputy sheriff who was guarding appellant to be careful because the doctor anticipated "another break."
Dr. Baker had been subpoenaed by the state and told to stand ready to testify but when it was his turn to take the witness stand, the state attorney announced that the doctor had gone fishing, so the trial proceeded and there was no direct testimony rebutting that given by the other two physicians.
In referring to the preliminary examinations by Drs. Hibbs and Baker we have undertaken to give the background of the case so far as the insanity of appellant was concerned but we make it plain now that only the testimony of Dr. Hibbs and Dr. Glickman given at the trial was considered by the jury.
It is clear to us that there was sufficient uncontradicted testimony of the appellant's insanity at the time of the homicide to raise a reasonable doubt as to his sanity. All men are presumed sane and when there is no evidence to the contrary a jury may act upon the presumption and determine guilt without concern for the sanity, or insanity, of a defendant. But when there is testimony of insanity sufficient to present a reasonable doubt of sanity the presumption vanishes. The defendant is then entitled to an acquittal if the state does not overcome the reasonable doubt. Britts v. State, 158 Fla. 839, 30 So.2d 363.
A reasonable doubt of appellant's sanity having been raised in this case and the state having failed to overcome it, it follows that the judgment must be 
Reversed, and remanded for a new trial.
TERRELL, C.J., and HOBSON, THORNAL and O'CONNELL, JJ., concur.