THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.*
HUMBERTO RIVERA RAQUEL, Defendant and Appellant.

No. CR-67-4.     Decided December 12, 1967.

*Edna Abruña Rodríguez, E. Armstrong Watlington,* and *Enrique
Miranda Merced* for appellant. *J. B. Fernández Badillo,
Solicitor General,* and *Peter Ortiz, Assistant Solicitor General,* for The People.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the
Court.

Appellant, after being found guilty by a jury of the
offense of statutory rape, was sentenced to serve from one
to two years in the penitentiary.

On appeal he assigns the commission of the following
errors:

"First Error: At the close of the evidence of the parties
with the testimony of Dr. Galíndez, the defense moved for

peremptory acquittal on the ground that when the defense of the presumption of sanity was controverted the People had to establish beyond a reasonable doubt, that the defendant was sane at the time of committing the acts.

".    .    .    .    .    .    .    .

"Second Error: The examination, which Dr. Galíndez practiced on defendant, was for the sole purpose of determining whether the defendant could stand trial and by itself did not show the defendant's sanity at the time of the alleged facts beyond a reasonable doubt as it was proper upon the defense overcoming the presumption of sanity."

We shall set forth briefly the essential facts before the jury when it returned its verdict of guilty.

The girl, Luisa Méndez Rodríguez, a minor 14 years old, lived in defendant-appellant's house in Carolina, Puerto Rico. She took care of the small children of the married couple and performed other tasks such as the cleaning of the house. The defendant did not work and remained at home while his wife went out to work. On May 28, 1965, the defendant, the children of the couple, and the girl, Luisa Méndez Rodríguez, were in the house. The defendant told his children to go outside, which they did. Then the defendant closed the door with its safety and went into the room where Luisa was going to iron. He threw her on the bed, brought down her panties and had sexual relations with her. As soon as he finished the defendant went to the bathroom and then left the house. As a result of the sexual act the minor, Luisa, bled abundantly. She went to the house of a neighbor called Gladys Pizarro and told her what had happened to her. Gladys in turn called defendant's wife and told her what her husband had done.

The defendant attempted to establish the defense of mental incapacity at the time of the alleged commission of the offense charged against him and to that end he introduced the testimony of the psychiatrist Dr. José C. Olmedo.

According to this testimony the defendant has been hospitalized some thirteen times in the Clínica Juliá which is an institution for the care and treatment of mental patients. In the year 1950 he was treated of a reaction of chronic anxiety. In 1952 he suffered from cortical frontal parietal atrophy of the right side. In 1953 a mental incapacity diagnostic was made. Since 1952 the diagnostic has been constant —a chronic cerebral syndrome due to cortical atrophia. He was confined in the hospital from November 8, 1963, to September 15, 1964. On this last date he was allowed to make a short visit to his home as part of the treatment but he did not return to the hospital within the time granted. The defendant returned to the hospital on June 2, 1965. He was much worse than when he left, for the permit to go home is granted when the person has shown improvement. The doctor indicates that there is a strong probability that on May 28, 1965, date on which the offense was committed, the defendant could not distinguish between right and wrong. When he returned on June 2, 1965, he was completely confused, perplexed, and in conditions which did not permit him to distinguish between right and wrong. The patients suffering from the disease which afflicts defendant suffer sometimes psychotic disorders. As a result of the psychosis the patient loses contact with reality. During the psychotic disorder "a state of intense confusion, agitation, aggressiveness occurs."

Asked whether he believed that the defendant could distinguish between right and wrong on May 28, 1965, he answered "There is a strong probability that he could not distinguish between right and wrong. That is not a statement which I can definitively make, really, because I did not see him on that occasion. I saw him on June 2, he was completely confused, perplexed, and in conditions in which he could not distinguish." He continues testifying that when there is a remission of symptoms of the psychotic disorder, the defects

caused by the organic lesion persist, which "is loss of memory, the loss of intelligence and understanding is associated with the intention and organic functioning. . . ."

Dr. Olmedo repeated again: "I cannot express an opinion on his incapacity that day [referring to the date of the commission of the offense] because that day I did not see him. I can say that there is a probability." When the defendant was allowed to go to his house he was not suffering from a psychotic disorder.

This expert testified also that although the defendant did not have a psychotic disorder at the time of the commission of the offense, he was considered medically incompetent. He reaffirmed that he could not say whether on that date the defendant could distinguish between right and wrong nor that the psychotic disorder he observed in defendant in the month of June was present on May 28, 1965. The witness stated further that the excessive use of alcohol by the defendant has been an important factor in producing recurrences and that as a result of tension, difficulties at home, because his wife was told that he had sexual relations with a girl, may also produce in him a psychotic disorder.

In order to rebut the theory for the defense, the prosecuting attorney introduced Gladys Pizarro's testimony to the effect that she spoke frequently with defendant and he expressed himself coherently. The prosecuting attorney introduced also the testimony of the psychiatrist physician, Dr. Galíndez Antero, who was one of the experts who examined defendant to give his opinion as to whether the latter was in condition to stand trial.

When this witness was asked in what manner was an individual's capacity to distinguish between right and wrong affected when that person was suffering from a chronic cerebral syndrome due to cortical atrophia of undetermined origin, he answered:

"I say, by a chronic cerebral syndrome, we understand in psychiatry, a process in which the functions of orientation, of the memory, of judgment and his affection are disturbed; among these there are different degrees, they may be chronic with certain severe symptoms or with minimum symptoms. When we say chronic we mean, irreversible arrests, that it will be for life. . . . That it does not improve?

"Certain aspects may improve but there will always exist certain manifestations in the aspects I mentioned before, now this notwithstanding if a person suffers from a chronic cerebral syndrome, if this chronic cerebral syndrome is not associated with a psychosis, which might or might not be, if it is associated with a psychosis, I would say that yes that he could not distinguish between right and wrong. If it is a chronic syndrome not associated with a psychosis he distinguishes, yes, he may distinguish between right and wrong, there are many persons operating in our society who can be functioning and they suffer from the chronic syndrome and they are productive persons and operate within our society." (Tr. Ev. 125, 126, and 127.)

The expert also testified that if the chronic cerebral syndrome is associated with a psychotic condition, then the person is incapable of distinguishing between right and wrong. If the psychosis is in a state of remission of symptoms the person can distinguish between right and wrong. The person cannot stand trial if he has an active psychosis.

The prosecuting attorney's expert testified further that when a person, as in this case, takes certain precautions before performing an act and realizes that he has to take such precautions, that person knows that from the legal point of view he is committing a wrong act.

In *People* v. *Alsina,* 79 P.R.R. 44 (1956), we established the rule of evidence which should govern when the question of insanity is raised to excuse from responsibility. We said in said case, at page 57:

". . . The law presumes that sanity is the normal condition, a presumption which is justified by human experience and

by considerations of public policy, and, hence, that the defendant was of a sound mind when he committed the act charged as an offense. By virtue of that presumption, The People is not required to offer any evidence to show that the defendant was sane at that moment, *unless* evidence is offered and received which may create a reasonable doubt as to sanity, which evidence must be furnished by the defendant if he relies on the absence of mental soundness for exemption from responsibility, but which may also develop from the evidence offered by The People when presenting its case. *Davis* v. *United States,* 160 U.S. 469; *Pribble* v. *People,* 49 Colo. 210, 112 Pac. 220; *Blocker* v. *State,* 92 Fla. 878, 110 So. 547; *Walters* v. *State,* 183 Ind. 178, 108 N.E. 583; *State* v. *Johnson,* 92 Kan. 441, 140 Pac. 839; *State* v. *Green,* 78 Utah 580, 6 P.2d 177. However, once there is evidence capable of creating that doubt, the presumption that the defendant was sane at the time of committing the act is overcome and the State is required to prove sanity as well as any other fact. After weighing the entire evidence as to the act charged and as to insanity, the trier is required to determine whether the prosecution has established defendant's sanity, his capacity to commit a crime, and, if it then entertains reasonable doubt, it is under the duty to give the benefit of that doubt to the defendant and to acquit him. *Martz* v. *People,* 114 Colo. 278, 162 P.2d 408; *Britts* v. *State,* 158 Fla. 839, 30 So.2d 363; *People* v. *Jenko,* 410 Ill. 478, 102 N.E.2d 783; *Limp* v. *State,* 228 Ind. 361, 92 N.E.2d 549; *People* v. *Eggleston,* 186 Mich. 510, 152 N.W. 944; *Williams* v. *State,* 205 Miss. 610, 39 So.2d 3; *State* v. *Moore,* 42 N.M. 135, 76 P.2d 19; *Gallagher* v. *State,* 81 Okla. Crim. 15, 159 P.2d 562."

■ In the same case we ratified the known doctrine that defendant's insanity at the time of committing the criminal act is what exempts from criminal responsibility.

■ In this case the expert physician of the defense created a doubt as to the mental soundness of the defendant at the time of committing the offense charged against him. That compelled the prosecuting attorney to establish the mental soundness of said defendant at that moment.

■ We have already said that for that purpose the prosecuting attorney introduced Gladys Pizarro, defendant's neighbor, and Dr. Galíndez as witnesses. The determination of defendant's insanity at the time of committing the offense depended principally on that there and then the defendant, as a consequence of the organic lesion of the brain, would be suffering from an active psychotic disorder. The defense's expert could not affirm that the day of the occurrence the defendant had suffered from a psychotic disorder in which case the defendant's insanity at that moment would have been established with sufficient certainty. Said expert referred only to the probability that it would have thus occurred. Considering the testimony of Gladys Pizarro and that of Dr. Galíndez to the effect, the latter, that the conduct observed by the defendant upon committing the offense, taking certain precautions, could denote that at that time the defendant could distinguish between right and wrong, created a conflict in the evidence as to defendant's insanity, which should have been settled, as it was, by the jury. See *People* v. *Sánchez*, 79 P.R.R. 110 (1956).

■ Although the examination practiced by Dr. Galíndez on the defendant was for the purpose of determining whether he could stand trial, nothing precluded the prosecuting attorney from asking him hypothetical questions on the basis of the facts established, on matters concerning his specialty as psychiatrist.

The reason for which the defendant came to the hospital in June 1965 in a worse condition than when he was given leave to go home, can be found in the explanation given by Dr. Olmedo, to the effect that the defendant's tension upon learning that his wife has knowledge of the unlawful act performed by him, as well as his arrest to be prosecuted for said act, could produce in defendant a psychotic disorder.

Considering that the errors assigned were not committed, the judgment appealed from will be affirmed.

Mr. Justice Belaval did not participate herein.