EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* HUMBERTO RIVERA RAQUEL, acusado y apelante.

*Número:* CR-67-4          *Resuelto:* 12 de diciembre de 1967

*Edna Abruña Rodríguez, E. Armstrong de Watlington y Enrique Miranda Merced,* abogados del apelante; *J. B. Fernández Badillo, Procurador General,* y *Peter Ortiz, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

El apelante, luego de ser declarado culpable por un jurado del delito de violación técnica, fue sentenciado a cumplir de uno a dos años de presidio.

En este recurso señala la comisión de los siguientes errores:

"Primer Error: Al finalizar la prueba de las partes con la declaración del Dr. Galíndez, la defensa solicitó la absolución perentoria por el fundamento de que al controvertir la defensa, la presunción de cordura, el Pueblo tenía que establecer más allá de toda duda razonable, que el acusado estaba cuerdo al momento de cometer los hechos.

. . . . . . . .

Segundo Error: El examen que le practicó el doctor Galíndez al acusado, fue al solo efecto de determinar si el acusado estaba procesable y en sí no demostró la cordura del acusado en la fecha de los supuestos hechos más allá de toda duda razonable como correspondía al controvertir la defensa la presunción de, cordura."

Expondremos brevemente los hechos esenciales que tuvo el jurado ante sí al rendir su veredicto de culpabilidad.

La niña Luisa Méndez Rodríguez, menor de 14 años de edad, residía en la casa del acusado-apelante en Carolina, Puerto Rico. Se dedicaba a cuidar los pequeños hijos del matrimonio y a realizar otras labores tales como la limpieza de casa. El acusado no trabajaba y permanecía en su hogar

mientras su esposa salía a trabajar. El 28 de mayo de 1965 se encontraba en la casa el acusado, los hijos del matrimonio y la niña Luisa Méndez Rodríguez. El acusado le dijo a sus hijos que se fueran para abajo, lo cual éstos hicieron. Entonces el acusado cerró la puerta con seguro y entró a la habitación donde Luisa iba a planchar. La tiró en la cama, le bajó los *"panties"* y tuvo relaciones sexuales con ella. Tan pronto terminó el acusado fue al inodoro y luego se marchó de la casa. Con motivo del acto sexual la menor Luisa sangró abundantemente. Fue a casa de una vecina llamada Gladys Pizarro y le relató lo que le había sucedido. Gladys llamó a su vez a la esposa del acusado y le relató lo que éste había hecho.

El acusado intentó establecer la defensa de incapacidad mental en el momento de la alegada comisión del delito impútadole y para ello presentó el testimonio del siquiatra Dr. José C. Olmedo.

De acuerdo con este testimonio el acusado ha estado hospitalizado unas trece veces en la Clínica Juliá que es una institución dedicada al cuidado y tratamiento de enfermos mentales. En el año 1950 fue tratado de una reacción de ansiedad crónica. En el 1952 padecía de atrofia cortical frontal parietal del lado derecho. En 1953 se le hizo un diagnóstico de incapacidad mental. Desde 1952 el diagnóstico ha sido constante—un síndrome cerebral crónico debido a atrofia cortical. Estuvo recluido en la clínica del 8 de noviembre de 1963 al 15 de septiembre de 1964. En esta última fecha se le permitió hacer una corta visita a su hogar como parte del tratamiento pero no regresó a la clínica dentro del tiempo concedídole para ello. El acusado regresó a la clínica el día 2 de junio de 1965. Estaba mucho peor que cuando salió pues el permiso para ir al hogar se da cuando la persona ha señalado mejoría. Indica el doctor que hay fuerte probabilidad de que el día 28 de mayo de 1965, fecha de la comisión del delito, el acusado no pudiera distinguir entre el bien

y el mal. Cuando regresó el 2 de junio de 1965 estaba completamente confuso, perplejo y en condiciones que no le permitían distinguir entre el bien y el mal. Los pacientes que padecen de la enfermedad que aqueja al acusado sufren a veces brotes de sicosis. Como resultado de la sicosis el paciente pierde contacto con la realidad. Durante el brote sicótico "viene un estado de confusión intenso, agitación, agresividad."

Preguntado sobre si creía que el acusado podía distinguir entre el bien y el mal el día 28 de mayo de 1965, contestó "Hay una fuerte probabilidad de que él no pudiera distinguir entre el bien y el mal. Eso no es una aseveración que yo puedo hacer definitiva, en definitiva, verdad, porque yo en aquella ocasión no lo ví. Yo lo ví el 2 de junio, estaba completamente confuso, perplejo y en condiciones que no podía distinguir." Sigue declarando que cuando hay una remisión de síntomas del brote sicótico, los defectos causados por la lesión orgánica persisten, que "es la falla de la memoria, la falla en la inteligencia y de comprensión está asociada con la intención y funcionamiento orgánico . . . ."

Volvió a repetir el doctor Olmedo: "Yo no puedo emitir una opinión sobre la incapacidad de él ese día [refiriéndose a la fecha de la comisión del delito] porque ese día yo no lo ví. Yo puedo decir que hay una probabilidad." Cuando le dieron pase al acusado para ir a su casa no estaba en brote sicótico.

Declaró además este perito que aunque el acusado no tuviera un brote sicótico para la fecha de la comisión del delito, se consideraba médicamente incompetente. Se reafirmó en que no podía decir si para dicha fecha el acusado podía distinguir entre el bien y el mal ni que el brote sicótico que observó en el acusado en el mes de junio estuviera presente el día 28 de mayo de 1965. Dijo además el testigo que el uso excesivo de alcohol por el acusado ha sido un factor importante en ocasionarle recaídas y que como resultado de una

tensión, dificultades en el hogar porque a su esposa le han dicho que él tuvo relaciones sexuales con una niña, pueden también producirle un brote de sicosis.

Para refutar la teoría de defensa, el fiscal presentó el testimonio de Gladys Pizarro al efecto de que ella conversaba frecuentemente con el acusado y éste se manifestaba en forma coherente. También presentó el fiscal el testimonio del médico psiquiatra Sr. Galíndez Antero, quien fue uno de los peritos que examinó al acusado para dictaminar si éste se encontraba en condiciones de ser sometido a juicio.

Al preguntársele a este testigo que en qué forma se afectaba la capacidad de un individuo para distinguir entre el bien y el mal cuando esa persona padecía de un síndrome cerebral crónico debido a atrofia acórtica de origen indeterminado, contestó:

"Digo, por síndrome cerebral crónico, nosotros entendemos en siquiatría, un proceso donde están alterados, alteradas las funciones de la orientación de la memoria del juicio y de su afecto, dentro de estas mismas hay distintos grados, pueden ser crónicos con ciertos síntomas severos o puede serlo con síntomas mínimas. Cuando decimos crónicas nos referimos, arrestos irreversible, que será de por vida . . . . Que no mejora?

"Puede mejorar ciertos aspectos pero siempre habrán ciertas manifestaciones en los aspectos que mencioné anteriormente, ahora a pesar de esto, de una persona padecer de un síndrome cerebral crónico, si este síndrome cerebral crónico no está asociado a una sicosis, que puede estarlo o no puede estarlo, si estuviera asociado a una sicosis, yo diría que sí que no podría distinguir entre el bien y el mal. Si es un síndrome crónico que no esté asociado a una sicosis, él distingue sí, puede distinguir entre el bien y el mal, hay muchas personas funcionando en nuestra sociedad que pueden estar funcionando y padecen y padecen el síndrome crónico y son gentes productivas y funcionan dentro de nuestra sociedad." (T.E. págs. 125, 126 y 127.)

Declaró además el perito que si el síndrome cerebral crónico está asociado a una condición de sicosis, entonces la

persona no podría distinguir entre el bien y el mal. Si la sicosis está en remisión de síntomas la persona sabe distinguir entre el bien y el mal. La persona no está en condiciones de ser procesada si tiene una sicosis activa.

Declaró además el perito del fiscal que cuando una persona, como en este caso, toma determinadas precauciones para realizar un acto y se da cuenta de que tiene que tomar esas precauciones, esa persona sabe que desde el punto de vista legal que está cometiendo un acto malo.

En *Pueblo* v. *Alsina,* 79 D.P.R. 46 (1956), establecimos la norma de prueba que debe regir cuando se plantea la locura como eximente de responsabilidad. Dijimos en dicho caso, a la página 60:

" . . . La ley presume que el estado normal es el de la cordura, presunción justificada por la experiencia humana y por consideraciones de orden público, y por ende, que el procesado estaba en su sano juicio en el momento de perpetrar el acto que se le imputa como delito. En virtud de esa presunción El Pueblo no tiene que presentar prueba alguna para demostrar que el acusado estaba cuerdo en ese momento, *mientras* no se ofrezca y reciba evidencia que pueda engendrar duda razonable sobre la cordura, evidencia que debe ser presentada por el encausado, si es que descansa en la ausencia de sanidad mental como eximente de responsabilidad, pero que también puede provenir de la evidencia aducida por el Pueblo al presentar su caso, *Davis* v. *United States,* 160 U.S. 469; *Pribble* v. *People,* 49 Colo. 210, 112 Pac. 220; *Blocker* v. *State,* 92 Fla. 878, 110 So. 547; *Walters* v. *State,* 183 Ind. 178, 108 N.E. 583; *State* v. *Johnson,* 92 Kan. 441, 140 Pac. 839; *State* v. *Green,* 78 Utah 580, 6 P.2d 177. Sin embargo, una vez que en la causa existe prueba capaz de crear esa duda, la presunción de que el acusado estaba en su sano juicio en el instante de perpetrar el acto, queda rebatida y el ministerio fiscal obligado a probar el sano juicio al igual que cualquier otro hecho. El juzgador, con vista de toda la prueba presentada en cuanto al acto imputado y a la locura, tiene entonces la obligación de determinar si el ministerio fiscal ha probado la sanidad mental del reo, su capacidad para delinquir, y si al hacerlo encuentra que tiene duda razonable sobre ello, su deber es dar el beneficio de

esa duda al inculpado y absolverle, *Martz* v. *People,* 114 Colo. 278, 162 P.2d 408; *Britts* v. *State,* 158 Fla. 839, 30 So.2d 363; *People* v. *Jenko,* 410 Ill. 478, 102 N.E.2d 783; *Limp* v. *State,* 228 Ind. 361, 92 N.E.2d 549; *People* v. *Eggleston,* 186 Mich. 510; 152 N.W. 944; *Williams* v. *State,* 205 Miss. 610; 39 So.2d 3; *State* v. *Moore,* 42 N.M. 135, 76 P.2d 19; *Gallagher* v. *State,* 81 Okla. Crim. 15, 159 P.2d 562." (79 D.P.R. págs. 60 y 61.)

■ En el mismo caso ratificamos la conocida doctrina de que la locura del acusado en el momento de cometer el hecho delictivo es lo que exime de responsabilidad criminal.

■ En este caso el perito médico de la defensa creó una duda en cuanto a la sanidad mental del acusado en el momento de cometer el delito imputádole. Ello obligaba al fiscal a probar la sanidad mental de dicho acusado en ese momento.

■ Ya hemos dicho que con ese propósito el fiscal presentó como testigo a Gladys Pizarro, vecina del acusado y al Dr. Galíndez. La determinación del estado de locura del acusado en el momento de cometer el delito dependía principalmente de que allí y entonces el acusado, como consecuencia de la lesión orgánica del cerebro estuviera padeciendo de un brote activo de sicosis. El perito de la defensa no pudo afirmar que el día de los hechos el acusado hubiera sufrido un brote de sicosis en cuyo caso la locura del acusado en aquel momento se hubiera establecido con bastante certeza. Dicho perito sólo se refirió a la probabilidad de que así hubiera ocurrido. Visto el testimonio de Gladys Pizarro y el del Dr. Galíndez al efecto este último de que la conducta observada por el acusado al cometer el delito, tomando determinadas precauciones podían denotar que en ese momento el acusado podía distinguir entre el bien y el mal, creaba un conflicto en la prueba sobre su locura, que debió ser resuelto, como lo fue por el jurado. Véase *Pueblo* v. *Sánchez,* 79 D.P.R. 116 (1956).

■ Aunque el examen que practicó el Dr. Galíndez al acusado fue a los fines de si éste se encontraba en condi-

ciones de ser sometido a juicio, nada impedía al fiscal hacerle preguntas hipotéticas a base de los hechos establecidos, sobre cuestiones que caían dentro de su especialidad como psiquiatra.

La razón por la cual el acusado ingresó en la clínica en junio de 1965 en peor estado que cuando se le dio el pase para ir a su hogar, puede encontrarse en la explicación que dio el Dr. Olmedo, al efecto de que la tensión del acusado al enterarse de que su esposa tiene conocimiento del acto ilegal realizado por él, así como su arresto para ser procesado por dicho acto, podían producir en el acusado un brote de sicosis.

*Considerando que no se han cometido los errores señalados la sentencia apelada será confirmada.*

El Juez Asociado Señor Belaval no intervino.