332 So.2d 615 (1976)
Jimmy Lee JONES, Appellant,
v.
STATE of Florida, Appellee.
No. 44669.
Supreme Court of Florida.
May 12, 1976.
*616 James A. Gardner, Public Defender, and Charles H. Livingston and Marion Moorman, Asst. Public Defenders, for appellant.
Robert L. Shevin, Atty. Gen., and George R. Georgieff, Asst. Atty. Gen., for appellee.
PER CURIAM.
Appellant was convicted by a jury of rape and of murder in the first degree. He is appealing the conviction and sentence for rape to the District Court of Appeal, Second District, but that proceeding is stayed pending disposition of this direct appeal of Appellant's conviction and death sentence for murder in the first degree.[1]
The facts of this case are as follows.
On Saturday, May 12, 1973, a postal carrier discovered a slumped and bloody body on a porch in Dade City at approximately 11:45 a.m. The decedent, Estelle Berkowitz, was last seen alive at about 6:00 p.m. on May 11th. The State's medical examiner attributed death to "blood loss from multiple stab wounds." The pathologist stated that the "majority of these wounds were quite superficial," being generally 3/4 to 1/2 inch in depth with the deepest wound being 1 1/4 inches in depth. The pathologist counted 38 "significant" wounds as well as many other superficial scratches. The wounds' nature indicated to the pathologist "some kind of a frenzied attack rather than a  coldly  calculated stabbing, homicide premeditated." The pathologist also found sperm in the deceased's vagina and noted a laceration in the back part of the lower end of the vagina. Such a laceration sometimes results from forceable sexual assault. There is overwhelming circumstantial evidence of Appellant's guilt in the record.
In investigating the scene of the homicide the police discovered pieces of broken glass, blood, matches, a pair of glasses, two small bone-like chips of materials, apparently from the handle of the bloody knife used as a murder weapon and found in Appellant's abandoned shack, a piece of metal about an inch long, small chips taken from the decedent's clothing, and a thumb print of Appellant on a piece of glass. There appeared to be signs of a struggle inside the apartment. The police detected a trail of spots that appeared to be blood and followed it; the last spot of blood was on a cinder block about 50 to 75 feet from the residence of Annie "Momma Chicken" and Leo "Poppa Hawk" Moorer. The blood on the cinder block was the same type taken from Appellant. Since the police surmised that the suspect was injured on one of his extremities, they publicly sought information about anyone who might have bandages *617 on his hands. As a result, they received information that a man with a cut right thumb was seen coming out of the Moorer yard. Appellant lived alone in a shack behind the Moorer residence. "Momma Chicken" saw Appellant on Saturday morning when he asked for a bandage for his hand; he had been drinking that Saturday and spent all day Sunday in his shack drinking. "Momma Chicken" said that Appellant left on Monday after borrowing a small amount of money from her which she assumed would be spent on something to drink. On Monday police officers searched both the Moorer residence and the shack vacated a few hours earlier by Appellant. In the shack they found two knives, one apparently with dried blood, an unmade bed, clothing, apparent blood stains on a pillow and shirt, a match box, and a knife sheath. Appellant was apprehended in Pennsylvania a week or ten days later.
At trial a convenience store clerk testified that Appellant had purchased wine in her store on various occasions; that on May 7 Appellant purchased a knife, writing materials, and a fifth of wine; that Appellant was acting very strange and looked like he had something dreadful or something on his mind. The witness feared Appellant was going to kill himself, and she thought that the knife purchased on May 7 was similar to one of the knives seized from Appellant's shack. One of Appellant's co-workers at a local citrus packing house testified that on either the day of the homicide or the day it was discovered Appellant appeared at work, that he was acting strangely, that he stated that he was going to kill somebody about his money and that he started throwing heavy barrels at another co-worker; the co-worker testifying had asked his foreman to assign him to another job because he didn't want to be near Appellant "with him acting like that." Appellant called both lay and expert witnesses to establish his defense of insanity. Appellant's "wife" testified that Appellant felt he was being pursued and threatened by persons unknown. Appellant admitted he drank a lot of wine both generally and during the period of the crime. A court-appointed psychiatrist found Appellant to be insane under the M'Naghten rule. A clinical psychologist specially selected by the prosecution concurred. Their examinations were brief and over three months after the crime. They recognized he was an alcoholic but said without alcohol he, in their opinion, did not know right from wrong when the crime occurred, due to health problems.
During the sentencing proceeding, the State emphasized three matters relating to aggravation: the commission of the homicide during the perpetration of burglary or rape; the heinous, atrocious and cruel nature of the homicide; and Appellant's previous three convictions of robbery, including one involving a weapon. Regarding mitigating circumstances, Appellant relied on the previously adduced psychiatric testimony; two written psychiatric reports were also admitted into evidence, showing that Appellant is suffering from a chronic paranoid schizophrenic illness associated with alcoholic addiction. Finally, Appellant introduced into evidence two letters from him to his "wife" which indicated his feelings of persecution. The jury unanimously recommended that Appellant be sentenced to life imprisonment, but the trial court sentenced Appellant to death without entering the required written findings of fact in support thereof. However, this Court issued an order of remand directing the trial court to make written "findings in support of sentence of death," which was done.
As a matter of great concern, this Court has examined carefully the aspect of the case raised in Appellant's Motion to Suppress Crucial Evidence taken from a shack occupied by Appellant at the time of the crime. The building was a small structure formerly used as a chicken house on the rear of the premises owned by the Moorers. Three days following the murder and after borrowing money from his landlady, which was not repaid, Appellant, who *618 had been previously convicted of felonies and has used two names other than his own, left town hurriedly on an obviously one-way trip north. Therefore, when police officers had traced the trail of blood to approximately 50 feet of the lot on which Appellant resided and, later, when the police had been informed that the man who had been living in the shack behind the Moorers had a seriously cut hand, it is our view that the consent given to the police by the landlady to examine the shack which she properly considered to be abandoned by Appellant was not a violation of the prohibition against unreasonable searches and seizures.[2] He simply did not live there anymore and had joined his "common law wife" in Pennsylvania.
The principle defense worthy of serious consideration by this Court is the defensive allegation that at the time of the murder Appellant was legally insane under the M'Naghten rule, which prevails in Florida, that is, he did not know right from wrong. After the State-selected psychologist and court-appointed psychiatrist examined Appellant, at least three months after the crime their evaluations indicated that his mental and emotional health coupled with his constant and almost unbelievable consumption of wine on a daily basis, prevented him from knowing right from wrong. On the other hand, the record is clear that the Appellant watched a television show with his landlady on Friday night prior to the murder, at which time he was sober and apparently speaking coherently; that he then expressed an intention to attend a late motion picture and left the premises apparently intending to do so. The record also shows that the following day he was sitting with his landlady on her front porch only a few feet from his shack when police officers appeared in the area following the trail of blood caused by his bleeding hand; and that upon seeing the police officers he was sufficiently sane to leave the porch immediately, demonstrating an obvious recognition of his crime. Further, it appears in the record that thereafter within hours he had borrowed money from his landlady and, although normally wearing a hat, had rushed away from the premises bareheaded, leaving with personal effects for Pennsylvania where he was later apprehended. At the time of his arrest in Pennsylvania he gave evasive answers, which indicates that he was trying to hide his crime. The ultimate question of insanity, like all other factual questions, is left for determination by the jury which weighed all the evidence. The jury, while deliberating, returned to ask the court whether it could grant mercy. Having carefully and objectively evaluated this record, we feel that the jury had a sufficient basis to determine, either by the M'Naghten rule or some of the other standards currently prevailing in the United States, that the Appellant was sufficiently sane to answer to the penalty imposed by law.
Appellant's second point on appeal relates to the trial court's restriction of his right to peremptorily challenge a potential juror before that juror is sworn in chief. At the prosecutor's request the court announced its policy toward the exercise of peremptory challenges prior to voir dire. The relevant colloquy follows:
"MR. YON: (Chief Prosecutor) Judge, what is your ground rule, if any, as to the timeliness of challenging prospective jurors, that you have to challenge after voir diring that particular jury, or as a result you can't challenge that particular juror later?
"THE COURT: Yes, sir.
"MR. MOORMAN: (Defense Counsel) Your Honor, I would object to proceeding on that basis, particularly in light of the limited number of peremptories the Defense has been granted. I think it's important that the Defense *619 be able to view the panel as a potential jury rather than making a decision on each individual venireman.
We would request that the Court allow peremptory challenges to be made at anytime prior to the entire panel being sworn.
"THE COURT: (pausing) I don't feel that's necessary. We'll proceed. Those that are not challenged at the conclusion of the questioning will be deemed acceptable."
We find that the court's policy directly contravenes the established case law,[3] as well as Rule 3.310, R.Cr.P., which provides that a defendant may challenge a prospective juror before the juror is sworn to try the case. Nevertheless, we fail to find from an examination of the record that non-compliance with the rule resulted in prejudice to the Appellant. In addition, when the rule is considered in pari materia with the provisions of our harmless error statute,[4] we fail to find that reversal is required. A careful review of the record convinces us that the evidence, though circumstantial, was so clear and convincing as to leave no reasonable doubt but that Appellant was guilty of the crimes for which the jury convicted him. Where the evidence of guilt is overwhelming, even a constitutional error may be rendered harmless.[5]
Turning to the imposition of the death penalty by the Judge, we have considered the foregoing factual background of testimony for and against Appellant; in weighing the aggravating and mitigating circumstances, the principle determinative fact directing the judgment of this Court is that the Appellant had a paranoid psychosis which was undenied and unrefuted, the degree of which no one can fully know. The record shows that for a long time Appellant had believed that persons were attempting to kill him and were following him and that he had other hallucinations. The testimony makes it clear that Appellant suffered a paranoid psychosis to such an extent that the full degree of his mental capacities at the time of the murder is not fully known, but it is reasonable to assume that this mental illness contributed to his strange behavior. Extreme emotional conditions of defendants in murder cases can be a basis for mitigating punishment.[6] The jury had the benefit of seeing and hearing Appellant as he testified in the courtroom, and all twelve members of the jury thought that Appellant should not die in the electric chair. After carefully reviewing the record this Court has determined that the recommendation of the jury was correct. Appellant clearly had a mental deficiency. The court should have followed the jury's recommendation for a life sentence.
It is true that the trial court erred in pronouncing the death sentence upon Appellant immediately after the jury's recommendation for the imposition of a life sentence without supporting that sentence by specific written findings of fact as required by statute.[7] We find, however, that this error was corrected when this Court issued its order remanding the cause to the trial court, which subsequently filed written "findings in support of sentence of death."
Accordingly, the cause is remanded to the trial court with instructions to vacate the sentence of death and to impose a life sentence without eligibility for parole for 25 years.
It is so ordered.
*620 OVERTON, C.J., and ADKINS, BOYD and HATCHETT, JJ., concur.
ROBERTS, J., concurs specially.
I would affirm the trial court since in my opinion there is no reversible error and the court performed within the orbit of its statutory authority.
SUNDBERG, J., concurs with an opinion, with which OVERTON, C.J., and ENGLAND, J., concur.
ENGLAND J., concurs in part and dissents in part with an opinion.
SUNDBERG, Justice (concurring).
I concur in the result reached by the majority but feel obliged to state separately the precise reasons why. As recited in the majority opinion, in the defendant's case there was substantial expert testimony by a psychiatrist appointed by the court and a clinical psychologist selected by the State that the defendant did not know the difference between right and wrong at the time he committed the offenses, the standard for insanity under the law as it exists in Florida today. There was lay testimony concerning the defendant's conduct, by individuals who had the opportunity to observe the defendant during periods preceding and subsequent to the tragic event.
It is the law of Florida that all men are presumed sane, but where there is testimony of insanity sufficient to present a reasonable doubt of sanity in the minds of the jurors the presumption vanishes and the sanity of the accused must be proved by the prosecution as any other element of the offense, beyond a reasonable doubt. Hodge v. State, 26 Fla. 11, 7 So. 593 (1890); Farrell v. State, 101 So.2d 130 (Fla. 1958); Parkin v. State, 238 So.2d 817 (Fla. 1970); Byrd v. State, 297 So.2d 22 (Fla. 1974).
In this Court the defendant maintains that the testimony of his expert witnesses created a reasonable doubt as to his sanity at the time of the offenses, thereby shifting the burden to the State to prove beyond a reasonable doubt his sanity. He argues that the State failed to meet this burden.
Pursuant to the obligation imposed by Rule 6.16, F.A.R., I have reviewed the evidence in this cause to determine if the interests of justice require a new trial. The evidence shows that the psychiatrist examined the defendant some 3 1/2 months after the offenses were committed and that his interview was approximately 60 minutes in duration. The doctor predicated his opinion in part upon statements given him by the defendant. His written opinion directed to the court prior to trial stated "that it would be extremely unlikely that [defendant] would know right from wrong" (emphasis supplied). During his testimony at trial the doctor diagnosed the defendant as a paranoid schizophrenic and unequivocally opined that he did not know the difference between right and wrong at the time of the offenses. He stated that his opinion would not be altered by the quantity of alcohol ingested by defendant on the date in question.
The clinical psychologist examined the defendant at the Pasco County jail some 4 1/2 months after the event. He spent approximately 6 1/2 hours with defendant administering an extensive battery of psychological tests and an additional 3 to 4 hours evaluating and interpreting the tests. It was his opinion that the defendant could not differentiate between right and wrong at the time the rape and homicide were committed. As elicited on cross-examination, however, the opinion of the psychologist was apparently grounded upon the premise that the underlying psychosis of paranoid schizophrenia became increasingly activated by use of alcohol, reducing the defendant's capabilities to contain his impulses of violence and rage. A fair inference to be drawn from his testimony is that defendant could control the underlying psychosis when not inebriated. The expert witness conceded that the defendant knew from previous experiences that consumption of alcohol would likely bring about violent conduct on his part.
*621 The lay testimony before the jury on the question of defendant's sanity, however, indicated that he was in a violent mood on the day preceding the nighttime rape and homicide; that several days preceding the offenses defendant appeared very distraught to a convenience store employee from whom he purchased a large quantity of wine and a knife similar to the one discovered at his shack; that on the evening of the crime defendant watched television with his landlady and did not at the time appear intoxicated; that on the day following the crime defendant departed the front porch of his landlady's house for his shack upon observing police officers searching for evidence in an area near the house; that defendant imbibed heavily on that day "to drink his troubles off"; that on the Monday succeeding the Friday night crimes defendant borrowed $3.00 from his landlady and abruptly left town for Pennsylvania where his common-law wife resided. Over the weekend prior to defendant's departure an appeal was broadcast by local police officials seeking information concerning an individual with a cut hand.
Based on the foregoing evidence I could reasonably conclude that the defendant created a reasonable doubt as to his sanity at the time of the commission of the crimes and, further, that the State then failed to carry its burden of proving sanity beyond a reasonable doubt. But that is not the test. The test is whether or not the evidence was such that the jury could only have concluded that there was reasonable doubt of sanity and the absence of evidence sufficient to overcome that reasonable doubt. See Byrd v. State, supra. In Byrd this Court affirmed a conviction of rape when the defendant introduced the testimony of two psychiatrists establishing insanity and the State produced no expert testimony on the issue, rather only two lay witnesses whose testimony tended to rebut the testimony of the defendant to the effect that he was directed by supernatural voices to commit the crime.
In the case at bar the jury could have refused to accept the opinion of the psychiatrist on the grounds that his examination was of short duration occurring 3 and 1/2 months after the fact and that the opinion was predicated in part upon statements given by the defendant which the jury could have concluded were self-serving. Likewise the jury could have rejected the opinion of the psychologist on the basis that it was predicated on the intoxicated state of the defendant at the time of the act. The evidence of intoxication was at best conflicting. It is the province of the jury to resolve such conflicts. See Byrd v. State, supra, at page 25. Similarly, even if the testimony of defendant's experts must be construed to compel a finding of reasonable doubt as to sanity, the jury was authorized to conclude from the lay testimony heretofore recited that the conduct of defendant prior and subsequent to the event, which pointed to sanity on his part, was sufficient to ovrecome the doubt created by the expert testimony.
An analysis of the cases on the subject of the defense of insanity makes it clear that it is peculiarly within the province of the jury to weigh the evidence adduced, both expert and non-expert, and make a determination accordingly. See especially Byrd v. State, supra. For this reason it was not error for the trial judge to submit the issue of defendant's sanity to the jury for determination.
By just as strong an argument, however, it was error for the able trial judge to reject the recommendation of the jury on the subject of sentence. Two categories of mitigating circumstances to be considered by the jury under the provisions of Section 921.141(6), Florida Statutes, are:
"(b) The capital felony was committed while the defendant was under the influence of extreme or emotional disturbance.

*622 * * * * * *
"(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." (emphasis supplied)
Although under the strict M'Naghten rule standard the jury could have concluded from the evidence that the defense of not guilty by reason of insanity was not available to the defendant, it is crystal clear from the evidence that at the time of the offenses the defendant was under the influence of extreme mental or emotional disturbance and his capacity to conform his conduct to the requirements of law was substantially impaired. The conclusion is compelling that the jury's unanimous recommendation of a life sentence was predicated on these mitigating circumstances. The evidence upon which the jury was entitled to conclude defendant was sane at the time of commission of the crimes was marginal at best. Because the matter was peculiarly within their function, their finding is not disturbed. Under these circumstances there should be some compelling reason for the trial judge to reject the jury's unanimous recommendation. It is the genius of the jury system that the jury may act as a tempering influence upon the unbending application of rules of law. It is clear to me that the exercise of such an influence is exactly what occurred in the case at bar. This jury represented the conscience and mores of the community in which the crimes were committed. They concluded that the penalty to be exacted by the community for the defendant's conduct, in light of all the emotional forces which were operating upon him at the time of commission of the crimes, should be imprisonment for life rather than death. Their recommendation, in this case, is compelling.
Accordingly, I concur in the judgment of the majority to remand for imposition of a life sentence without eligibility for parole for 25 years.
OVERTON, C.J., and ENGLAND, J., concur.
ENGLAND, Justice (concurring in part and dissenting in part).
While I concur with the majority's resolution of two of the three issues discussed, and with the concurring opinion of Justice Sundberg, I am again compelled to record my dissatisfaction with the process by which we modify our rules on a case by case basis to achieve selective results. See Lavatt v. State, 316 So.2d 261 (Fla. 1975) (concurring opinion).
Under Rule 3.310 of the Florida Rules of Criminal Procedure, which we promulgated, both the state and any criminal defendant are granted what appears to be an unconditional right to challenge each individual prospective juror before he or she is sworn to try the cause. This has been the "law" of Florida since 1860, and at least one of our district courts so firmly thought the Rule meant what it said that, in reliance on that Rule, it reversed a conviction which was fully justified by the evidence at trial. Walden v. State, 319 So.2d 51 (1st DCA Fla. 1975). Today a majority of the Court amends that Rule to say that a challenge at certain stages must be accompanied by a showing of prejudice.
The practical effects of this change may well be to force trial judges (1) to swear juries before it is necessary to do so, with attendant inconvenience to the jurors and possible expense to the state, or (2) to conduct a special inquiry into "prejudice" at the time of some challenges made before the jury is sworn. In the absence of guidelines as to what is or is not prejudicial to one of the parties, trial judges desiring to avoid retrials will have a difficult time performing this newly-added task. It is precisely for these reasons that rules should be amended in rule-making proceedings, where all of the ramifications of a change can be explored.
NOTES
[1] Article V, Section 3(b)(1), Florida Constitution.
[2] U.S.Const. Amend. IV.
[3] Ellis v. State, 25 Fla. 702, 6 So. 768 (1889); Walden v. State, 319 So.2d 51 (Fla.App. 1975); Shelby v. State, 301 So.2d 461 (Fla.App. 1974); Knee v. State, 294 So.2d 411 (Fla.App. 1974).
[4] Section 924.33 Florida Statutes.
[5] Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).
[6] Section 921.141(6), Florida Statutes.
[7] Section 921.141(3), Florida Statutes; State v. Dixon, 283 So.2d 1, 8 (Fla. 1973).